## Richmond

Carthon Johnson v. Commonwealth of Virginia.

April 22, 1968.

Record No. 6694.

Present, All the Justices.

W. Tayloe Murphy, Jr., for plaintiff in error.

Reno S. Harp, III, Assistant Attorney General (Robert Y. Button, Attorney General, on brief), for defendant in error.

Carrico, J., delivered the opinion of the court.

Carthon Johnson, the defendant, was convicted by the jury of burglary (Code, § 18.1-86); and his punishment was fixed at ten years in the penitentiary. Following approval of the verdict and imposition of punishment by the trial court, the defendant was granted a writ of error.

The sole question to be decided is whether the trial court improperly admitted into evidence an oral confession made by the defendant to law enforcement officers concerning his involvement in the offense for which he was convicted. The evidence relating to that question is as follows:

In the early morning hours of June 12, 1966, a home in Richmond County was burglarized and one of its occupants injured by the burglar. The sheriff was called to the scene; and after a brief preliminary investigation, he sent his deputy to a nearby dwelling where the defendant, aged 16, was staying with his grandmother. The deputy was instructed to "see if [the defendant] was there and if he was to bring him to the Sheriff's Office." The sheriff sent for the defendant because of "previous experience that [he] had had with him."

The deputy found the defendant at the grandmother's home and took him to the sheriff's office sometime before 3 a.m. The sheriff questioned the defendant for approximately one-half hour about the burglary but, before doing so, advised him that he had the right to remain silent; that if he did make a statement, it could be used in court against him; that he had "a perfect right to the advice of counsel"; and that counsel would be called "if he suggested."

The defendant denied any knowlege of the crime. During the questioning, the sheriff observed that the defendant was wearing clean trousers and clean shoes, but no socks. The sheriff asked the defendant to take his shoes off; and when he complied, the sheriff noticed that his feet were muddy. The sheriff asked the defendant "where he had gotten the mud." The defendant indicated that he had gotten muddy while "playing out on the Scott Town Road" the preceding evening. He insisted, however, that "he had washed his feet before he went to bed." The sheriff then remarked, "if you washed your feet before you went to bed, you have gotten up since then." The defendant "denied it."

The defendant admitted that he was not wearing the same clothing he had worn the night before, and a deputy was dispatched to secure the other clothes. When the deputy returned, he delivered to the sheriff a pair of muddy trousers; and a sock was found in each side pocket. The defendant "gave no explanation . . . of that," and he was asked if he was willing to take a lie detector test. He first agreed, but then hesitated and said to the sheriff: "I would want to talk to my mother . . . I have got a right to talk to a lawyer because you told me so." With that, the questioning ended.

The defendant was returned home, but was instructed by the sheriff "not to leave the house" because he "probably would" be questioned later.

After daybreak, the sheriff conducted a further investigation and

found a pair of shoes on the lawn near the house where the crime was committed. He also found in a nearby field a "set of foot tracks with shoes" leading toward the burglarized house and a "set of bare-foot tracks" leading toward the home where the defendant was staying.

The sheriff and a state police investigator went to the grand-mother's home and asked to see the defendant. When the defendant appeared, he was requested to accompany the investigator to the field where the footprints had been discovered.

Before going to the field, the investigator told the defendant that he had a right to counsel before making any statement and that any statements that he made could be used in court for or against him. The investigator then took the defendant to the field and showed him that casts were being made of the footprints. The investigator placed the defendant's "foot in several of the tracks," and "the impressions made in the soil were similar to the size of his foot." The defendant was questioned as to how he had gotten mud on his feet the night before. When he admitted that he had not earlier told the sheriff the truth about his muddy feet, the defendant was asked "if he was ready to tell . . . anything about this case"; and he replied, "yes."

The investigator asked the defendant "if he would step over to the Sheriff's car." The defendant said that he "didn't want to get in the Sheriff's car and talk about it." The investigator then asked the defendant if he would like to go "right to the Sheriff's office and talk about it"; and the defendant said, "yes." According to the testimony of the investigator, the defendant stated that "he would rather go where I could talk to him in private." The investigator also testified that he "had an idea that [the defendant] was going to tell me that he did it."

The defendant was taken to the sheriff's office at 9:45 a.m. The state police investigator and the defendant went into a conference room. The investigator informed the defendant that he had a right to remain silent; that he did not have to make any statement; that any statement he made could be used for or against him in court; that he had a right to counsel before he made any statement; and that he could talk to an attorney.

The defendant orally confessed the commission of the crime to the investigator. He explained that before entering the house where the crime was committed, he had taken off his shoes and socks and had placed the shoes on the lawn where they were found by the sheriff and the socks in his trouser pockets. He stated that after

leaving the house, he ran across the field to his grandmother's home without stopping to get his shoes.

The sheriff was then called into the conference room, and the investigator asked the defendant to "give the same statement." The sheriff advised the defendant that he did not have to make any statement; that he had a right to remain silent; that any statement he made could be used in court against him; that he had a right to the advice of counsel; and that he could have counsel present if he desired. The defendant repeated his confession to the sheriff, and he was then arrested and charged with burglary.

After the defendant was certified for trial as an adult and was indicted, his court-appointed counsel filed a written motion to suppress the statements made by him to the law enforcement officers on the ground that he had not been effectively advised of his right to counsel or to have counsel appointed for him. A hearing was held upon the motion, and it was overruled. The defendant's counsel also objected to the introduction of the statements at trial, and the objections were overruled.

The defendant's motion to suppress and his objections to the admissibility of the oral confession at trial were based upon the case of *Miranda* v. *Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694, 10 A.L.R. 3rd 974 (1966), decided June 13, 1966, just one day after the confession in issue here was made by the defendant. In *Miranda*, the Supreme Court said:

" . . . [W]e hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to

answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." 16 L. ed. 2d, at 726.

\* \* \*

"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent—the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. . . ." 16 L. ed. 2d, at 723.

Here, although the record shows that the defendant was warned repeatedly by the sheriff and the state police investigator of certain of his rights respecting his privilege against self-incrimination and that he understood those warnings, it is conceded that he was not told that if he was indigent, a lawyer would be appointed to represent him before interrogation was undertaken. Since he was not so told, the defendant says, "the trial court . . . erred in admitting [his] confession."

The Commonwealth first takes the position that the *Miranda* requirement that an accused be advised of his right, if indigent, to appointed counsel is not applicable to this case because "there was no showing that at the time the statement was taken [the defendant] was indigent and unable to secure counsel." The Commonwealth also relies on "evidence in the record indicating that at one time the family considered employing an attorney to represent [the defendant]."

We do not, however, read *Miranda* to say that the defendant is under a burden to show his interrogators that he is indigent before the warning relating to appointed counsel must be given. In delineating the right to that specific warning, the Supreme Court stated:

" . . . As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express ex-

planation to the indigent of this right can there be assurance that he was truly in a position to exercise it." 16 L. ed. 2d, at 723.

In a footnote to the foregoing statement, the Court said:

"While a warning that the indigent may have counsel appointed need not be given to the person who is known to have an attorney or is known to have ample funds to secure one, the expedient of giving a warning is too simple and the rights involved too important to engage in ex post facto inquiries into financial ability when there is any doubt at all on that score." Footnote 43, 16 L. ed. 2d, at 723.

There is nothing in the record before us to suggest that at the time the defendant gave the confession in issue, the law enforcement officers had any reason to believe that he had an attorney of his own or had ample funds to secure one. The slight evidence in the record that "the family considered employing an attorney" relates to a conversation which took place between the sheriff and the defendant's father, who was separated from the defendant's mother, after the confession had been made and a warrant had been issued and executed for the defendant's arrest. The trial court's appointment of counsel to represent the defendant is attestation that he was indigent and that no attorney was employed in his behalf.

The Commonwealth further contends that the *Miranda* decision is not applicable to the case before us because at the time the defendant confessed the commission of the crime, "he was not 'in custody' in that he was not being detained, had not been arrested, and voluntarily went to the Sheriff's Office to make a statement to the police." *Miranda*, the Commonwealth says, applies only to "custodial interrogation."

It is true that in *Miranda* the Supreme Court said that the procedural safeguards there specified were applicable to statements made by a defendant "stemming from custodial interrogation." But the Court went on to say that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 16 L. ed. 2d, at 706. In a footnote to the latter statement, the Court explained that the foregoing definition of "custodial interrogation" was "what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." Footnote 4, 16 L. ed. 2d, at 706.

The reference in the footnote was to the case of *Escobedo* v. *Illi-*

*nois*, 378 U. S. 478, 84 S. Ct. 1758, 12 L. ed. 2d 977 (1964). In *Escobedo*, the Court had held that the requirement to warn a defendant of the rights there delineated attached when "the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession." 12 L. ed. 2d, at 987. The Court indicated that the process shifts from investigatory to accusatory when the investigation "has begun to focus on a particular suspect." 12 L. ed. 2d, at 986.

Here, there can be no doubt that almost from the moment the investigation of the crime was undertaken, the defendant was suspected of being the perpetrator thereof. Although there was some testimony that another named subject was also under suspicion, the record shows that he was never questioned.

After a brief preliminary investigation at the scene of the crime, the sheriff immediately sent his deputy to find the defendant. The defendant was found and taken to the sheriff's office, where he was questioned. His denial of any involvement in the crime obviously did not satisfy the sheriff, and he was returned home with the admonition "not to leave the house" because he "probably would" be questioned later.

The defendant was next questioned in the field where the footprints were found. Suspicion of his involvement in the offense by that time had been brought into sharper focus by the connection of the muddy condition of his feet with the footprints in the field and the pair of shoes, later identified by the defendant as his, found on the lawn of the burglarized house. When the defendant admitted to the investigator that he had not earlier told the sheriff the truth about how he had gotten his feet muddy, he was asked by the investigator "if he was ready to tell . . . anything about this case." Upon his affirmative answer, he agreed to go to the sheriff's office so the investigator "could talk to him in private."

When the investigator took the defendant to the sheriff's office, the investigator "had an idea that he was going to tell . . . that he did it." The defendant was then "a particular suspect," in the words of *Escobedo*, and, at least in the investigator's mind, was the prime suspect in the case. In fact, the investigator admitted on the witness stand that when he and the defendant went into the conference room at the sheriff's office, he was "seeking a confession."

At the sheriff's office, the defendant was interrogated; and he confessed the commission of the crime. The Commonwealth says, however, that the defendant was not then in custody, and the *Miranda*

rules do not apply. The Commonwealth apparently relies, in this respect, upon the testimony of the investigator that the defendant agreed to accompany him to the sheriff's office so they could talk "in private," and upon the sheriff's testimony that from the time the defendant was asked to accompany the investigator to the field where the footprints were found "until he made the statement at the Sheriff's office . . . he could have gone home."

The Commonwealth's position, however, overlooks the fact that the trial court found that the defendant was "taken into custody." It also overlooks the evidence that after the first period of questioning by the sheriff, the defendant was returned home with the admonition "not to leave the house." The Commonwealth's position further overlooks the testimony that when the investigator and the defendant were in the field inspecting the footprints, the defendant's mother arrived on the scene and asked the sheriff if she could talk to her son. She was refused permission to do so. When the defendant later was taken to the sheriff's office and was being interrogated, his mother and his uncle arrived at the office and permission was requested for the mother to see her son. That request was likewise refused. If the defendant was free to go home had he desired, the record does not indicate that he or any member of his family so understood.

It must be admitted that the defendant's confession was voluntary, in the sense that it was made without coercion or enticement and after repeated warnings which, before *Miranda*, should have been sufficient to satisfy any court of its voluntariness. But we are compelled, in view of *Escobedo* and *Miranda*, to hold that the circumstances of this case show that at the time the defendant was questioned about and confessed the commission of the crime, he had been "deprived of his freedom" in a "significant way," and thus was subjected to "custodial interrogation" without the prior warning that he was, if indigent, entitled to appointed counsel.

Under *Johnson* v. *New Jersey*, 384 U. S. 719, 86 S. Ct. 1772, 16 L. ed. 2d 882 (1966), the *Miranda* rules were made applicable to any trial commenced after the date of the *Miranda* decision, June 13, 1966. The defendant's trial commenced after that date, and since the *Miranda* requirements were not satisfied, the defendant's confession was improperly admitted into evidence. *Dailey* v. *Commonwealth*, 208 Va. 452, 158 S. E. 2d 731 (1968).

We take note of the argument of the defendant, in the brief of his able counsel, that even if he was properly advised of his right to appointed counsel, he did not waive his right against self-incrimina-

tion and his right to appointed counsel. The Commonwealth does not rely upon waiver, but solely upon the proposition that *Miranda* is inapplicable to the case at hand—a proposition here held to be unsound. In any event, the record before us is not sufficient to justify a holding that the defendant, especially in view of his age, waived the rights upon which he now relies.

For the error in admitting the defendant's confession into evidence, the judgment of the trial court will be reversed and the case remanded for a new trial not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*