## Richmond

ROGER KEITH COLEMAN

V.

COMMONWEALTH OF VIRGINIA

September 9, 1983.

Record No. 821816.

Present: All the Justices.

*Stephen E. Arey (Terry L. Jordan,* on briefs), for appellant.
*Jacqueline G. Epps, Senior Assistant Attorney General (Gerald L. Baliles, Attorney General,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Tried by a jury under indictments charging him with the rape of Wanda Faye Thompson McCoy and with the willful, deliberate, and premeditated killing of the same victim during the commission of rape, capital murder as defined in Code § 18.2-31(e), Roger Keith Coleman was found guilty as charged. The jury fixed his punishment for rape at confinement in the penitentiary for life. In the second part of the bifurcated proceeding required by Code §§ 19.2-264.3 and -264.4 in the capital murder case, the jury fixed Coleman's sentence at death. On April 23, 1982, after considering the probation officer's report, the trial court imposed the death sentence; in the same order, the court entered judgment on the jury verdict in the rape case.[1] We have consolidated the automatic reivew of Coleman's death sentence with his appeal of his conviction of capital murder and have given them priority on our docket.

The evidence against Coleman was entirely circumstantial; it will be stated in the light most favorable to the Commonwealth. Bradley D. McCoy, 21, testified that on the date of the murder he and his wife, Wanda Fay McCoy, who was 19, lived on the outskirts of Grundy in a rented house at Long Bottom on Slate Creek. The McCoys, who had been married for two and one-half years, had no children. Wanda was not employed; her husband was a parts clerk for United Coal Company, working the second

---

[1] Coleman filed a separate petition for appeal of the rape conviction. The petition was this day denied.

shift from 3:00 p.m. to 11:00 p.m. On March 10, 1981, at 2:15 p.m., McCoy went to work, leaving Wanda at home alone.

McCoy testified that about 9:00 p.m. he telephoned Wanda "to see if she was okay." They talked about 10 or 15 minutes, discussing among other things how they would spend an anticipated income tax refund. McCoy said he always telephoned his wife at this time, when he took a break from work, because she was "more or less afraid to stay by herself" and was "shy." She did not indicate anyone was with her and McCoy believed she would have told him "if anyone was there or had been there that day."

At the end of his shift, McCoy drove home in his car, arriving about 11:15 p.m. Although Wanda usually left the porch light on for him, no outside lights were shining when he knocked on the door; Wanda usually kept both the storm door and the wooden front door locked. Receiving no answer, McCoy opened the storm door, which was unlocked, then opened the front door with his key, and entered the living room. He saw that the coffee table had been moved, there were "slight drips of blood on the floor," and the light and the television were on. He called for Wanda but heard nothing. Going to the back bedroom, where a light was on, he found his wife lying on her back on the floor. Her hair was pulled over her face, she had a wound in her chest, and there was blood beside her head. Her arms were stretched behind her head and her legs were lying straight out and apart. She appeared to be dead; McCoy did not touch her. He found no signs of forced entry into the house.

McCoy telephoned his father, Max McCoy, known as Hezzie, who lived 400 to 500 yards away, and told him that Wanda had been killed. McCoy turned on the porch light, initially waited for his father, but after a few minutes ran to meet him. After Hezzie called the sheriff's office at 11:21 p.m., McCoy and his father returned to McCoy's house, looked at the body but did not touch it, and met the police officers who began to arrive.

McCoy said that Coleman's wife was a younger sister of Wanda's, that the Colemans lived in the home of Coleman's grandmother, which was a five-minute walk from the McCoy house, and that on the night before Wanda's death the Colemans stopped by the McCoys' but only Coleman's wife came into the house.

Sergeant Steven D. Coleman, of the Buchanan County Sheriff's Department, arrived about 11:25 p.m. accompanied by another of-

ficer. He tried to check Wanda's neck for a pulse but found it "so badly torn up" that he could not do so. There was a large gaping hole in the front of her neck; a pool of blood was around her head.

Other local and state law enforcement officers promptly came to the McCoy house to assist in the investigation. Randall S. Jackson, Chief of Police for the Town of Grundy, arrived about 11:27 p.m. He observed what appeared to be bloodstains on the floor and wall of the living room, and "tracks of blood, where something had been dragged" through the hallway and into the bedroom in which he found Wanda's body. Jackson felt her wrist, which was "very warm," but found no pulse. He sent an officer for Dr. Thomas D. McDonald, the medical examiner, and arranged to secure the premises. At daybreak, Jackson measured the depth of Slate Creek, located 75 to 100 yards from the McCoy house, at 10 to 12 inches.

Dr. McDonald, who lived nearby, arrived at 11:35 p.m. He made a superficial examination of Wanda, confirmed that she was dead, but did not move her pending the arrival of a State Police special investigating unit. Wanda was lying on her back, partially clothed, with her panties around her left ankle, arms over her head, and legs extended. She had a large laceration of the neck and two puncture wounds in her chest. Dr. McDonald determined that the cause of death was the "slashing wound to the throat." The body was still warm, rigor mortis had not set in, and Dr. McDonald estimated that Wanda had died about 10:30 p.m., or within 30 minutes before or after that time.

A neighbor testified that when she took the trash out of her house about 10:30 p.m. she saw the porch light burning at the McCoy residence.

The Commonwealth offered color photographs showing the scene of the crime and different views of the victim's body. Over Coleman's objection, the trial court admitted 14 of the photographs after excluding two as repetitious and one as inflammatory.

The victim's body was removed to Roanoke where Dr. David W. Oxley performed an autopsy on March 12. Dr. Oxley testified that death was caused by a "slash wound" of the throat with cutting of the "right carotid artery, jugular vein and larynx." He also found two stab wounds in the chest. One, measuring 1¼ inch by 1/16 inch, with a depth of 4 inches, had penetrated the heart and lung. Because there was little or no hemorrhaging from this wound Dr. Oxley concluded it had been inflicted after death. The

other, measuring 1¾ inch by 1/16 inch, also with a depth of 4 inches, had penetrated the liver; Dr. Oxley was of opinion that this wound was inflicted after death or close to the time of death. He described the neck wound as a single cut, two to three inches in depth without "hesitation marks," leading from the right side of the neck to the left and downward.

Dr. Oxley found two foreign hairs in the victim's genital area. He submitted these, samples of her pubic hairs, blood, swabs from her mouth, hands, vagina, and rectum, and the panties found wrapped around her left foot, to Elmer Gist, Jr., a forensic scientist.

Out of the presence of the jury, the trial court conducted a hearing on the admissibility of statements made by Coleman on March 11 and 12 to Jack E. Davidson, Special Agent with the Virginia State Police, one of the investigating officers. Davidson testified there were several suspects, including Coleman, whose activities police were "exploring at that particular time." He and another officer went to Coleman's grandmother's residence on March 11 and asked Coleman "if it was all right, if he could talk to us." According to Davidson, Coleman said "sure," and the interview was conducted, beginning at 12:32 p.m., as the two sat in Davidson's car; the other officer remained at the house.

Davidson explained that he did not give Coleman *Miranda* warnings because the suspect was "not in an accusatory status" but was "in an investigative status." Davidson said Coleman was not under arrest and was free to go at any time. The officer was unable to record his interview because of a malfunction of the equipment; but he made notes of Coleman's statement. Coleman was a coal miner, employed by T J and M Coal Company. His statement was exculpatory, purporting to account in detail for his time on the night of the killing. Thus, he said he left his home at 8:30 p.m., left the Speedy Market at 9:05 p.m., went to other listed places at specified times before and after finding that his shift at the mine had been terminated, and arrived at 10:50 p.m. at the bathhouse in town where he took a shower and changed his clothes before returning home.

When Davidson asked Coleman for the clothes he wore that night, Coleman turned over to him a plastic bag of clothing and a knife. In the bag was a pair of dirty blue jeans; the bottom 10 to 12 inches of each pants leg were wet. Davidson had the clothing delivered to the Bureau of Forensic Science in Roanoke.

On March 12, Davidson interviewed Coleman again. Davidson testified that Coleman was still a suspect, but was free to leave if he wished to do so, and was not given *Miranda* warnings. Davidson told Coleman that he had investigated the mine site and found there was no water there to get his blue jeans wet. Coleman then said when he took a shower at the bathhouse, he probably laid his blue jeans down and water from the shower got them wet. Subsequently, Coleman relinquished another knife to Davidson. Coleman was arrested on April 13.

Over Coleman's objection, the trial court ruled the statements of March 11 and 12 were admissible because Coleman gave them when he was neither under arrest nor in a "custodial interrogation situation" but instead was free to leave; *Miranda* warnings, therefore, were not required. A portion of one of the statements relating to polygraph examinations was excluded.

On March 13, Davidson testified, he met Coleman "at his in-laws' residence" and asked if he would consent to a search for body fluids and hair. Davidson said Coleman agreed and, after being informed of his constitutional right to insist upon a search warrant, signed a consent authorizing a warrantless search of his body. The consent permitted removal of any property "or body fluids." Davidson testified that Coleman also consented to have samples of body hair taken. Over Coleman's objection, the trial court ruled, on the basis of Davidson's uncontradicted testimony, that Coleman had consented to a search of his body and that all items taken in the search would be admissible. Davidson stated that samples of Coleman's blood, head hairs, pubic hairs, and saliva were taken and mailed to the Bureau of Forensic Science.

Elmer Gist, Jr., a forensic serologist employed by the Commonwealth of Virginia Bureau of Forensic Science, testified that he made an analysis of the items delivered to him by Dr. Oxley and the investigating officers. He said the two apparently foreign hairs found in Wanda's pubic area were, in fact, not those of the victim but were consistent with pubic hair samples taken from Coleman. Gist concluded that these two hairs came either from Coleman or, by a possible but unlikely coincidence, from some other person of the same race whose hair had the same color, diameter, general configuration, and microscopic characteristics.

Gist testified that Coleman was a secretor, one whose "blood type factor" is present "in semen, saliva or other body fluids," and that 80% to 85% of the population are secretors. Gist determined

that Coleman had Type B blood, a rare type possessed by only 10% of the population. Wanda's blood was type O, a type which 40% to 45% of the population have; her husband's was Type A. From Gist's examination of the vaginal specimen taken from the victim's body he found that spermatozoa had been deposited in her vagina by a secretor with Type B blood. He also determined that a bloodstain on Coleman's blue jeans was made by Type O human blood. Gist found blood on one of Coleman's knives but not in sufficient quantity to enable him to determine whether it was human or animal blood. According to Gist, Coleman's blue jeans were dirty and had "blackish stains on the upper legs in particular." Photographs of the victim depicted a very dark, fine substance on her hands.

Charles Crabtree, owner of the Speedy Market, testified that Coleman came into his store on March 10 about 8:00 p.m. and stayed about ten minutes.

Gary Scott Stiltner testified that on March 10 he was scheduled to work his regular 3:30 to 11:30 shift but had not gone to work. About 10:15 or 10:20 p.m. Coleman came to his trailer in Boyd's Trailer Park, where he and his wife, Sandra, and infant daughter lived, and asked for the return of a tape which Stiltner's wife had borrowed. Upon receiving the tape, Coleman departed.

Sandra K. Stiltner recounted an incident that occurred on Friday, March 6. Shortly after her husband went to work that afternoon, Coleman stopped by her trailer and discussed tapes with her and a neighbor. During a brief interval when they were alone, Coleman asked her what she liked to drink and offered to get her whatever she wanted, but she declined and left to join other neighbors. Sandra Stiltner also testified that when Coleman stopped by for his tape on March 10 she glanced at a clock and noticed that it was 10:20 p.m.

Roger L. Matney, a convicted felon, testified that when he had been incarcerated in the same cell block with Coleman in the county jail, Coleman had described for him the killing and rape of the victim. According to this witness, Coleman drew on a newspaper a diagram of the McCoy house and said he and another man were in the house and after the victim's husband called her about 9:00 p.m., Coleman's companion cut her and she began to scream.

Matney believed Coleman said the other man was "Danny Ray."[2] Coleman told Matney the two men took the victim to the bedroom and both raped her. The knife "was supposed" to have been hidden under Black Watch Bridge. Coleman began to say something about a paper towel when the conversation ended. (Other evidence of the Commonwealth showed that a paper towel was found near the victim's body).

At the conclusion of the presentation of evidence by the Commonwealth, Coleman moved to strike the evidence as to the charge of capital murder because Matney's testimony showed that Coleman did not inflict the fatal wound. The trial court, concluding that the Commonwealth was not bound by Matney's testimony relating to statements alleged to have been made to him by Coleman, denied the motion.

Elmer T. Miller, a forensic scientist, testifying for the defense, said that from his examination of swabs received from Dr. Oxley he determined that the very dark, fine substance found on the victim's hands was soil and particles of plant material, not coal dust.

Other witnesses for the defense testified to times and places they had seen Coleman on the night of the crimes. Kermit Stiltner said he saw Coleman at the Speedy Market about 8:00 p.m. and talked with him 10 or 15 minutes. Johnny L. Stiltner, a night watchman at T J & M Coal Company, who also regularly drove miners to the mine, saw Coleman in work clothes at Breeding's Store about 9:25 p.m. and told him Coleman had been "laid off" his job which normally began at 9:30. Coleman followed Stiltner to the mine, "got his stuff," and left between 9:30 and 9:45. Ronald G. Perkins, second shift foreman at T J & M Coal Company, saw Coleman about 10:00 p.m. when he came to the mine for his boots and hat. Coleman was bearing blue jeans, which the witness did not think were wet. Philip VanDyke, who worked at another mine, met Coleman at the mouth of Looney's Creek about 10:10. They talked for 10 to 15 minutes and parted company about 10:25 to 10:30. Other evidence established that from the mouth of Looney's Creek it was approximately four miles to the McCoys'

---

[2] The record shows that the trial court, upon affidavit of the Commonwealth Attorney, entered an order on March 11, 1982, under The Uniform Act to Secure the Attendance of Witnesses from without a State in Criminal Proceedings, Code § 19.2-272, *et seq.*, to secure the attendance of Danny Ray Stiltner, of Floyd County, Kentucky, to testify as a witness for the Commonwealth. Stiltner was not called as a witness at trial. It appears from the record that Stiltner, like Coleman, was a brother-in-law of the victim.

neighborhood and eight miles to Boyd's Trailer Park, the McCoy residence being approximately halfway between the two. VanDyke clocked in at his mine across the creek at 10:41. Gary Owens saw Coleman alone in his truck near the Gary Scott Stiltner trailer between 10:00 and 11:00.

Coleman's wife, Patricia, 17, testified that between 8:00 and 8:30 on March 10 her husband left for work from his grand-mother's house where they were living. She did not recall when he came home but he explained that he had returned early because he had been "laid off." The night before the murder, she and Coleman drove to the McCoys' house. Patricia returned some recipes to her sister while Coleman remained in the truck. The Colemans often visited the McCoys and "a couple of times" stayed with Wanda when her husband was at work.

Garnett M. Coleman testified that Coleman was her grandson but she and her husband had adopted him when he was 14 and he had lived with her nearly all his life. According to her, Coleman left to go to work on March 10 about 8:30 and returned about 11:05. She said that she "got mixed up" when she first told one of the investigating officers Coleman came home at 11:30.

Coleman, 23, testified in his own defense. He described the events at Boyd's Trailer Park on March 6. That day, he said, he and David Keller got off work about 6:30 or 7:00 a.m., went to the trailer of Keller's brother, Tom, and spent the day drinking. Several of them went to the Stiltner trailer and in the company of Sandra Stiltner listened to tapes, including one Coleman brought from his truck. After 30 to 45 minutes, Coleman departed, forgetting to take his tape.

Coleman's testimony about his activities on March 10 closely followed the statement he gave to Special Agent Davidson on March 11. Coleman said he left home at 8:30, drove to the Speedy Market, got a box there, talked to Crabtree and Kermit Stiltner, and left about 9:05. He drove to the mouth of Looney's Creek, arriving at 9:10, but his transportation to the mines had already left. He drove on to Breeding's Store, where he found the "man trip" (vehicle used to transport workers to the mines) stopped. Johnny Stiltner and David Keller were there; Stiltner told Coleman his shift had been laid off. After five or ten minutes Coleman drove back to Grundy but remembering that he had left his mining equipment at the mine, he turned around about 9:25 or 9:30, and drove to the mine site, arriving about 9:45 or 9:50. He

talked to Perkins, the second-shift foreman, Johnny Stiltner, and David Keller. Leaving the mine site about 10:00 he met VanDyke on the road. At the mouth of Looney's Creek they talked for 15 or 20 minutes. Coleman said he looked at his watch for the exact time only at 8:30 when he left home and about 9:05 when he left the Speedy Market. All other times to which he testified were estimated.

Coleman said he drove to Boyd's Trailer Park to see Tom Keller but when he discovered the lights were out at Keller's trailer he went to the Stiltner trailer and retrieved the tape he had left there. It was then about 10:40 to 10:45. Coleman drove to the bathhouse in Grundy, arrived about 10:50, showered, left about 11:00, and was at home about 11:05. His pants probably got wet when he threw his work clothes on the floor of the shower. He said the blue jeans he had been wearing that evening were the pants he had worked in the two previous evenings. He acknowledged that on March 11 he told Davidson that he probably got his pants wet at the mines. He conceded that in going from the mouth of Looney's Creek to Boyd's Trailer Park and then to the bathhouse he passed the McCoys' residence, but he denied having stopped there or having murdered or raped Wanda McCoy. He found out about the crimes when Peggy Stiltner, his wife's sister, came to his grandmother's house after midnight.

Coleman denied having made any admission to Matney or any other inmate of the jail. He said he had heard some details of the crime from his wife's family. He related to inmates what he had learned, that the victim's throat had been cut, she had been stabbed twice, she only had her socks on, and a paper towel had been found. According to Coleman, his uncle, who apparently got the information from Randall Jackson, told him about the towel.

On cross-examination Coleman acknowledged that he knew Bradley McCoy worked the second shift. Later in his testimony, when he was asked how Type O blood got on his blue jeans, he replied that the cat at his house might have scratched someone there, or that someone at the mine the night before might have been cut. Coleman was then shown a picture of the victim depicting blood on her right leg and was asked whether the blood on the left leg of his pants had not actually come from the right leg of the victim. An objection to this question was overruled; Coleman answered in the negative. Coleman said the blood found on one of

his knives was from squirrels he had killed in September or October.

Coleman said "[i]t seemed like . . . [the officers] came just about every other day, sometimes every day, for three or four days in a row," he was willing to talk with them and he cooperated because he was "trying to clear" himself "so the police would go on and find who did this."

The Commonwealth called two rebuttal witnesses. Patricia Coleman said she was not aware the cat had scratched anyone in such a fashion as to cause blood to get on her husband's blue jeans; Randall Jackson denied having told Coleman's uncle about a paper towel found at the scene of the crimes.

Shortly before 11:00 p.m. on March 18, 1982, the jury found Coleman guilty of capital murder. On the next morning, Coleman's motion to set aside the verdict on the ground the evidence was insufficient was denied. The sentencing phase of the trial followed promptly.

Brenda F. Rife, 36, testified as a witness for the Commonwealth. She described an attempted rape committed by Coleman on April 7, 1977. On that date, the witness stated, because of flooding several days earlier, electric and telephone services were cut off and all the schools were closed. As she was a school teacher, she remained at home with her six-year-old daughter after her husband left for work that morning. Coleman, whom she had never seen before, was admitted to the house when he asked for a drink of water. After some conversation, Coleman pulled a gun and forced her to tape her daughter's hands and feet and place her in a child's rocking chair. Coleman then walked Mrs. Rife at gunpoint upstairs to the bedroom where he ordered her to undress. When she refused, he ripped open the bathrobe she wore, threw her on the bed, and got on top of her. She struggled, scratched the intruder on the neck, and attempted to dissuade him from his purpose. Seizing an opportunity to escape when Coleman went for his gun, which he had laid down, Mrs. Rife ran downstairs, picked up her daughter, and fled from the house. Coleman ran after them and attempted to pull them back inside but in the ensuing struggle Mrs. Rife seized his weapon, threw it under the porch, and screamed for help. As neighbors came to the rescue, Coleman ran away. The entire episode lasted approximately ten minutes, according to Mrs. Rife, and throughout this time Cole-

man "never really raised his voice," which she described as "[v]ery cold." She recalled, "It was just like, do it or die."

The Commonwealth introduced a certified copy of Coleman's conviction for the attempted rape of Brenda Rife. He was sentenced to serve three years in the State penitentiary by order entered July 29, 1977, by the Circuit Court of Buchanan County.

The defense called two ministers as witnesses. Thomas F. Bradley, a jail chaplain, visited Coleman six days a week during the period of three months prior to trial when Coleman had been incarcerated in jail in Bristol. Bradley stated that his communications with Coleman were privileged. Contrary to the recommendation of his attorneys, Coleman declined to waive the privilege and asserted that he did not want to appear to be "using the Lord" in any way. The minister testified that he believed Coleman was sincere in his religious convictions.

Michael Trent, minister of Little Prater Church of Christ, had known Coleman since he was about nine years old but had not had "a good connection with him" during the past ten years. He had come to know him personally after Coleman was incarcerated. Coleman decided to be baptized about a month after he was first confined and, at his request, Trent baptized him in jail. Coleman pursued Bible study in jail; Trent believed he was sincere.

Coleman testified again in his own behalf. He said that after the jury found him guilty it made no difference whether the penalty was death or life imprisonment, that "[i]t's up to the Lord now, anyway."

On appeal, Coleman challenges the denial by the trial court of his motion for a change of venue, rulings of the court during the guilt phase of the trial, and the sufficiency of the evidence of his guilt. He has not alleged that errors were committed during the sentencing phase of the trial.

## I. Change of Venue.

Coleman filed a pretrial motion for a change of venue. At a hearing on the motion, Coleman presented five newspaper articles appearing in a newspaper of local circulation in Buchanan County to show that there was prejudice against him in that jurisdiction. The Commonwealth presented numerous affidavits of citizens stating that Coleman could receive a fair trial in Buchanan County. By order entered January 5, 1982, the trial court denied the motion for a change of venue.

Coleman notified the court by letter dated February 15, 1982, that he was not satisfied with his attorneys' efforts to obtain a change of venue, that his uncle was obtaining signatures on a petition stating that Coleman could not receive a fair trial in the county, that a sign at a local gas station in Grundy stated in reference to the case, "Time for another hanging in Grundy," and that he had received threats of death or bodily harm. No petition was ever filed.

It appears from the record that the trial court questioned forty-two prospective jurors, and excused fourteen because they had formed an opinion as to guilt or innocence and eight because they were unwilling to impose the death penalty under any circumstances. Coleman then renewed his motion for a change of venue. The trial court denied the motion but stated that "much leniency" would be granted to Coleman's counsel in proceeding with individual *voir dire* of each of the twenty prospective jurors remaining. Moreover, the court gave assurances that if the *voir dire* so justified the court would consider another renewal of the motion. Extensive and searching *voir dire* was conducted. On motion of Coleman's counsel, the trial court struck for cause and replaced one member of the panel who did not satisfy the court that he fully understood the presumption of innocence to which the defendant was entitled. Coleman's counsel made no other motions to strike for cause and did not renew the motion for a change of venue.

Coleman acknowledges that a motion for a change of venue is addressed to the sound discretion of the trial judge whose action in overruling the motion will not be reversed unless the record shows an abuse of discretion. *Coppola* v. *Commonwealth,* 220 Va. 243, 247, 257 S.E.2d 797, 801 (1979), *cert. denied,* 444 U.S. 1103 (1980). He also concedes that the burden is on him as the moving party to rebut the presumption that he can receive a fair trial by a local jury in the jurisdiction where the offense occurred. *Id.* at 248, 257 S.E.2d at 801. Coleman argues, however, that the trial court abused its discretion in denying his motion. This argument is without merit.

We disposed of a similar contention in *Clanton* v. *Commonwealth,* 223 Va. 41, 49-50, 286 S.E.2d 172, 176-77 (1982) where the factual situation was analogous. Here, as in *Clanton,* the record fails to show any widespread prejudice against the defendant in the jurisdiction where the crime was committed. The trial court, while exercising commendable caution in excusing any pro-

spective juror whose impartiality appeared to be doubtful, had no unusual or unexpected difficulty in impaneling a jury free from bias. All the jurors who were impaneled assured the court they had formed no opinions as to Coleman's guilt or innocence and would decide the case on the basis of the evidence in accordance with the court's instructions. We hold, therefore, that the trial court did not abuse its discretion in denying Coleman's motion for a change of venue.

## II. Admissibility of Evidence.

### A. Coleman's statements.

█ Coleman argues that the statements which he gave to Special Agent Davidson on March 11 and 12, 1981, were given during custodial interrogation when he had not been given the warnings against self-incrimination mandated by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and were, therefore, inadmissible. He relies primarily upon *United States* v. *Gibson*, 392 F.2d 373, 376 (4th Cir. 1968), stating that custodial interrogation "includes all station-house or police-car questioning initiated by the police," and also upon *Moore* v. *Ballone*, 658 F.2d 218 (4th Cir. 1981).

We are not persuaded by *Gibson* or *Moore* that Coleman was entitled to *Miranda* warnings. The language quoted above from *Gibson* is dicta; indeed, that decision held that a suspect who was located in a tavern by a police officer, asked to step outside, and questioned on the sidewalk, was not the subject of custodial interrogation. Thus, although *Miranda* warnings had not been given, the statement was held to be admissible. In *Moore,* the statement of a suspect who had been taken to a police station, questioned extensively, and told many times that if he talked he could leave, was held to have been given during custodial interrogation and was excluded because no *Miranda* warnings had been given. The numerous circumstances indicating that the suspect in *Moore* was in custody are not present in this case.

The Supreme Court has made it clear that the prescribed warnings must be given before statements are taken from suspects only where there is custodial interrogation as thus defined in *Miranda*: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444 (footnote omitted).

It is the custodial nature rather than the location of the interrogation that triggers the necessity for giving *Miranda* warnings. *See Beckwith* v. *United States,* 425 U.S. 341, 346 (1976). Thus, under certain circumstances police must inform a suspect of his constitutional rights even though he is questioned in his home. *See Orozco* v. *Texas,* 394 U.S. 324 (1969). Conversely, the giving of *Miranda* warnings is not required in every case where a suspect is interrogated at police offices. *See Oregon* v. *Mathiason,* 429 U.S. 492 (1977).

In *Mathiason,* a suspect came to police offices at an officer's request and was there questioned about and confessed to a burglary. The officer informed the suspect he was not under arrest, but that he was believed to be involved in the burglary. The officer also made the false statement that the suspect's fingerprints had been found at the scene. After a few minutes, the suspect confessed, and the confession, not preceded by *Miranda* warnings, was held to be admissible. The Supreme Court held that it was clear from the record that the suspect's freedom to leave the police station was not restricted in any significant way. *Miranda* warnings are not required, the Court held, unless the suspect's freedom has been so restricted as to render him "in custody." 429 U.S. at 495.

In *Johnson* v. *Commonwealth,* 208 Va. 740, 160 S.E.2d 793 (1968), cited by Coleman, we held that the defendant was in custody at the sheriff's office when he confessed. Members of his family were denied access to him during various interrogations and his freedom was significantly restricted. 208 Va. at 747, 160 S.E.2d at 798. We held that failure to give the defendant *Miranda* warnings rendered his confession inadmissible.

The trial court in the present case found that the statements were taken from Coleman during non-custodial interrogation. The evidence supports this finding. Special Agent Davidson testified that Coleman was one of several suspects interviewed at the investigatory stage about the crime. Coleman's statements were exculpatory rather than inculpatory and Coleman was not arrested until a month after he gave the statements. He was asked to cooperate and, as he freely admitted when testifying in his own defense, he did so voluntarily. We hold that the trial court did not err in ruling that Coleman's statements of March 11 and 12, 1981, except for irrelevant matter deleted without objection, were admissible as statements given during non-custodial interrogation.

## B. Photographs.

Coleman says the trial court erred in admitting in the guilt phase several photographs of the victim's body which he claims were unduly inflammatory. In particular, he objects to Commonwealth Exhibits 7, 8, 10, and 17. All were color photographs. Exhibit 7 showed the position of the body when it was found. Exhibits 8 and 10 showed the victim's hands with dark stains and blood on them. Exhibit 17 was a photograph, taken by Dr. Oxley at the autopsy room in Roanoke, showing the slashing wound to the victim's neck.

The trial court examined all the photographs proffered by the Commonwealth, excluded three, and, relying on *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202, *cert. denied,* 442 U.S. 924 (1979), admitted fourteen, including Exhibits 7, 8, 10, and 17.

The admissibility of photographs is a matter resting within the sound discretion of the trial court. *Clanton* v. *Commonwealth,* 223 Va. at 51, 286 S.E.2d at 177; *Stamper* v. *Commonwealth,* 220 Va. 260, 270, 257 S.E.2d 808, 816 (1979), *cert. denied,* 445 U.S. 972 (1980). We reject Coleman's contention that the trial court abused its discretion in admitting any of these photographs.

Exhibit 7 tended to support other evidence that the victim's body had been dragged from the living room through the hallway and into the bedroom. It also corroborated other evidence that the victim's panties were wrapped around her left ankle. Exhibit 8 showed the victim's left hand resting on the floor. Exhibit 10 showed her right hand in a similar position. There were fresh spots of blood on the floor near her left hand. Both hands, including her fingernails, were discolored, from which a reasonable inference might be drawn that she struggled with her assailant and got dirt on her hands from his clothing. Exhibit 17 showed the nature and extent of the fatal wound. Dr. Oxley described the measurements of the wound. The photograph itself, however, showing the wound after blood had been wiped away from other parts of the body, was relevant to a determination that the killing was willful, deliberate, and premeditated. Moreover, an autopsy photograph by its very nature is more clinically objective and less bloody than one taken at the scene of a violent crime. That the photographs were harmful to Coleman is undeniable. Much of the Commonwealth's evidence in this case, as in every case, was prej-

udicial to the defendant. But to be inadmissible, the photographs had to be so inflammatory that they would tend to induce a guilty verdict, regardless of the other evidence in the case.

We do not find that the trial court abused its discretion in admitting the photographs in the guilt trial.

### C. Evidence obtained in body search.

Coleman signed a consent to a warrantless search of his body. The consent did not expressly authorize the removal of hair, and Coleman argues that the scope of the search and the ensuing seizure was limited by the language of the authorization. *See Lugar* v. *Commonwealth,* 214 Va. 609, 202 S.E.2d 894 (1974). Consequently, he says the trial court erred in admitting body hairs that he alleges were improperly removed from him at the same time body fluids were properly taken. There is no merit in this contention.

The consent form signed by Coleman authorized "a complete search" of his body. Special Agent Davidson testified that he explained to Coleman when the consent was signed what items were sought. Davidson stated that the words "or body fluids" were written on the form before Coleman signed. Davidson also said he informed Coleman that body hairs were needed and Coleman orally consented to have such hairs removed.

Consent to search may be oral as well as written. *See Lowe* v. *Commonwealth,* 218 Va. 670, 239 S.E.2d 112 (1977), *cert. denied,* 435 U.S. 930 (1978). The trial court, based on Davidson's uncontradicted testimony, found that Coleman consented to the search for the items proffered in evidence by the Commonwealth. We agree. The consent authorized seizure of these items, and we hold that the trial court did not err in admitting the products of the search.

### III. Cross-examination of Coleman by the Commonwealth Attorney.

Elmer Gist, Jr., the serologist, testified that there was Type O blood on Coleman's blue jeans. He did not specify where on the pants he found the blood. When the blue jeans were offered in evidence, Coleman's objection to their admissibility on the basis of a break in the chain of custody was sustained, and the blue jeans were excluded.

Coleman, asked by his counsel on direct examination whether the pants he wore on the night of the murder were dirty, replied that there was coal dust on them. During extensive cross-examination, the Commonwealth Attorney questioned Coleman as follows:

Q. Now, sir, I will show you a picture of Wanda Fay Thompson McCoy's legs and it shows blood here on her right leg. Isn't that how blood got on the left leg of your pants, from her leg?

A. No, sir.

Defense counsel objected that there was no evidence as to blood on the left leg of the pants. The Commonwealth Attorney replied that Gist's evidence showed there was Type O blood on the left leg of the pants, and the trial court overruled the objection. The questioning continued as follows:

Q. Isn't that how you got blood on those pants? You were down on her raping her and you got blood on your pants, didn't you?

A. No, sir.

Q. And your left leg came in contact with her right leg?

A. No, sir.

Coleman says the trial court erred in overruling his objection to the Commonwealth Attorney's question based upon an incorrect statement that the evidence showed Type O blood on the left leg of the blue jeans. The Commonwealth Attorney could properly cross-examine Coleman as to matters brought out on direct examination, including the condition of his clothing. The cross-examination could properly focus on the presence of blood on Coleman's blue jeans. Although the Commonwealth Attorney, in responding to Coleman's objection, incorrectly stated there was testimony from Gist that blood was on the left leg of the blue jeans, he could properly ask Coleman if the blood was not on the left leg and if the blood had not come from the victim's right leg during his commission of rape. Coleman answered all the questions in the negative, just as he answered in the negative questions asked on direct

examination whether he had committed the crime charged or was present in the McCoy house when Wanda McCoy was murdered.

The trial court did not err in overruling Coleman's objection to the questions. The Commonwealth Attorney's question suggested a possible and reasonable explanation for the presence of human blood on Coleman's pants. Coleman was free to and did deny this and other aspects of the Commonwealth's version of the events which took place on the night of March 10, 1981.

## IV. Instruction XIII.

██ The trial court, over Coleman's objection, gave the jury Instruction XIII which read as follows:

The Court instructs the jury that:

When the death of the victim occurs in connection with rape, it shall be immaterial in the prosecution thereof whether the alleged rape occurred before or after the death of the victim.

Coleman says the court erred in giving this instruction because there was no evidence whether the victim was dead before or after the alleged rape. Coleman also says the instruction was unnecessary because of Instruction IV. We reject both contentions.

Instruction XIII was based on Code § 18.2-63.1.[3] The trial court gave it because it was "helpful to the jury." Without the instruction, the jury might have been misled. Instruction IV only provided as to the capital murder charged in this case that the Commonwealth must prove beyond a reasonable doubt *inter alia* that "the killing was of a person during the commission of rape." The jury reasonably could have inferred from the evidence that the victim was murdered first and then raped. Without the guidance of Instruction XIII the jury might have concluded that Coleman could not be found guilty of capital murder if the rape had been committed after the murder. The trial court, therefore, did not err in granting Instruction XIII.

---

[3] Code § 18.2-63.1 provides:

When the death of the victim occurs in connection with an offense under this article, it shall be immaterial in the prosecution thereof whether the alleged offense occurred before or after the death of the victim.

## V. Sufficiency of the Evidence.

Coleman moved to set aside the verdict of guilty on the ground that the evidence was insufficient as a matter of law to support the verdict. He argues that the Commonwealth's forensic evidence was not unqualified and that, based on other evidence of the Commonwealth showing times and distances, he could not possibly have committed the offenses.

The victim died between 10:00 and 11:00 p.m. As there was no evidence of forced entry into her house, the jury reasonably could infer that she knew her assailant and voluntarily admitted him. Coleman was her brother-in-law, had with his wife visited in the house when the victim's husband was at work, and knew the husband worked the second shift. Two witnesses placed Coleman at Boyd's Trailer Park approximately four miles from the McCoy residence, about 10:20. The McCoys' porch light was still shining around 10:30. McCoy found his wife's body upon returning from work about 11:15. These times were not fixed with scientific precision, but were only estimates believed to be reasonably accurate. In any event, however, they readily disprove Coleman's contention that the Commonwealth's evidence established that he could not have been at the McCoy house when the crimes were committed.

The legs of Coleman's blue jeans were wet for 10 to 12 inches from the bottom; Slate Creek, not more than 100 yards from the victim's house, was 10 to 12 inches deep the morning following the crimes. The jury reasonably could infer that Coleman waded across the creek to and from the McCoy residence.

Roger Matney testified that Coleman confessed that he raped the victim after his companion killed her, and that Coleman mentioned a paper towel. The jury reasonably could have concluded that Coleman alone was with the victim and saw the paper towel at the scene.

The forensic evidence established that the spermatozoa found in the victim's vagina came from a secretor with Type B blood, that Coleman was a secretor with Type B blood, that the foreign pubic hairs found in the victim's genital area were consistent with Coleman's pubic hair, that the human bloodstain found on Coleman's blue jeans was made by Type O blood, and that the victim's blood was Type O. Blood was also found on one of Coleman's knives, but it could not be classified. The jury reasonably could infer from the evidence that Coleman cut the victim with his knife and raped her either before or after inflicting the fatal blow.

Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt. *See Stamper* v. *Commonwealth,* 220 Va. at 272, 257 S.E.2d at 817; *Turner* v. *Commonwealth,* 218 Va. 141, 145-46, 235 S.E.2d 357, 360 (1977). We hold that the evidence in this case meets the required standard and is, therefore, sufficient.

## V. Review of the Death Sentence.

 Under Code §§ 19.2-264.2 and 19.2-264.4C,[4] a jury may impose the death sentence upon either of the alternative findings therein provided. In the present case, the trial court, without objection, gave the jury an instruction stating the verdict form specified in Code § 19.2-264.4D. The prosecutors argued to the jury both alternatives, that Coleman would be a continuing serious threat to society, and that his conduct in committing the capital murder was outrageously or wantonly vile. The jury returned a verdict, handwritten in the exact language of the verdict form, fixing Coleman's punishment at death. It is readily apparent that the jury based its sentencing verdict on both statutory alternatives; indeed, Coleman has never contended otherwise. *Cf. Quintana* v. *Commonwealth,* 224 Va. 127, 148, 295 S.E.2d 643, 653 (1982), *cert. denied,* 460 U.S. 1029 (1983).

 A trial court, pursuant to the provisions of Code § 19.2-264.5, is required to have a probation officer make a thorough investigation of the defendant's history "and any and all other relevant facts." The statute further provides that "[a]fter consideration of the report, and upon good cause shown," the court may set aside the death sentence and impose in lieu thereof a sentence of imprisonment for life. The conviction order states that the court considered the probation officer's report, that the defendant was given the opportunity to cross-examine the probation officer, and that, upon Coleman's motion, references in the report to juvenile

---

[4] Code § 19.2-264.4C provides as follows:

The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

court proceedings in which Coleman was involved were deleted. The court then imposed the death sentence. We find nothing in the record to show that Coleman established good cause for the trial court to set aside the sentence of death.

We are required, under the provisions of Code § 17-110.1C to determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

As we have demonstrated, the trial court did not abuse its discretion in admitting in evidence photographs showing the scene of the crimes and the victim's body. These photographs were relevant and probative and we find nothing in the record to indicate that they caused the jurors to act under the influence of passion. The *voir dire* established that the jurors who were impaneled were not prejudiced against Coleman and were prepared to decide the case on the evidence presented to them. From our careful review of the record, we hold that the verdict of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

In determining whether the sentence of death was excessive or disproportionate, we have compared the present case with all other capital murder cases that have been reviewed by this Court. We have given particular emphasis to those cases where the death sentence was based upon both the dangerousness of the defendant and the vileness of the crime.

We have affirmed death sentences imposed upon findings of both dangerousness and vileness in these cases: *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979); *Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116, *cert. denied,* 444 U.S. 919 (1979); *Stamper* v. *Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), *cert. denied,* 445 U.S. 972 (1980); *Turner* v. *Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied,* 451 U.S. 1011 (1981); *Linwood Earl Briley* v. *Commonwealth,* 221 Va. 532, 273 S.E.2d 48 (1980), *cert. denied,* 451 U.S. 1031 (1981); *James Dyral Briley* v. *Commonwealth,* 221 Va. 563, 273 S.E.2d 57 (1980); *Clanton* v.

*Commonwealth,* 223 Va. 41, 286 S.E.2d 172 (1982); *Quintana* v. Commonwealth, 224 Va. 127, 295 S.E.2d 643 (1982), *cert. denied,* 460 U.S. 1029 (1983). In *Smith,* for example, the defendant, who had previously been convicted of rape, confronted his victim alone on a beach, forced her at knife point to disrobe, raped her, choked her, held her head under water, and stabbed her several times. The facts were somewhat analogous to those in the present case, where the jury found that Coleman, who had previously been convicted of attempted rape, raped his victim, cut her throat, dragged her through her house, and stabbed her twice at or after her death.

From our review of the cases, we hold that the sentence of death imposed upon Coleman was not excessive or disproportionate to sentences generally imposed by Virginia juries in crimes of a similar nature.

We have found no reversible error in the rulings of the trial court, and we have independently determined that the sentence of death was properly imposed. Accordingly, we will not disturb the verdict establishing guilt, we decline to commute the sentence, and we will affirm the judgment of the trial court.

*Affirmed.*