Roger Keith COLEMAN, Petitioner,

v.

Charles E. THOMPSON,
et al., Respondents.

Civ. A. No. 92–0352–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

May 13, 1992.

Roger W. Mullins, Tazewell, Va., for petitioner.

Kathleen A. Behan, pro se.

Donald R. Curry, Asst. Atty. Gen., Richmond, Va., for respondents.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, Senior District Judge.

This case is presently before the court on a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

A jury in the Circuit Court of Buchanan County ("circuit court") sentenced Roger Keith Coleman to death on April 23, 1982, for the murder and rape of his sister-in-law, Wanda McCoy. The Supreme Court of Virginia affirmed his convictions and sentences on September 9, 1983. *Coleman v. Commonwealth*, 226 Va. 31, 307 S.E.2d 864 (1983). Subsequently, the United States Supreme Court denied Coleman's first petition for a writ of certiorari on March 19, 1984. *Coleman v. Virginia*, 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 145 (1984).

Coleman then filed a petition for a writ of habeas corpus in the circuit court on April 26, 1984. He amended that petition on September 7, 1984, and alleged ineffective assistance of counsel, trial error, and misconduct by the Commonwealth during pretrial discovery. The amended petition also attacked the credibility of the jail house informant, Roger Matney. The circuit court held an evidentiary hearing on November 12–13, 1985, denied relief in an opinion dated June 23, 1986, and entered final judgment in an order signed on September 4, 1986. This order was not, however, docketed by the court clerk until September 9, 1986. Coleman's attorneys filed a notice of appeal on October 7, 1986. On October 25, 1986, Coleman moved the circuit court to correct the final judgment

date, from September 4, 1986 to September 9, 1986. The circuit court denied this motion. Thus Coleman's notice of appeal was not filed within the statutory 30–day period after the September 4, 1986, order. Va. Sup.Ct.R. 5:9.

On December 3, 1986, Coleman again appealed to the Supreme Court of Virginia. On May 19, 1987, the court granted the Commonwealth's motion to dismiss for failure to file timely the notice of appeal. The court also denied a subsequent petition for rehearing. Likewise, the Supreme Court of the United States denied Coleman's second petition for a writ of certiorari on October 19, 1987. *Coleman v. Bass*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 227 (1987).

On April 26, 1988, Coleman filed a federal habeas petition in this court alleging, as in his state court petition, ineffective assistance of counsel and prosecutorial misconduct in pretrial discovery. For example, Coleman alleged that the Commonwealth failed to disclose in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a crime scene report that mentioned a fingerprint and pry mark on the door of the victim's house. In a letter to this court, Coleman's counsel stated they were pursuing informal discovery and if not satisfied, would submit a formal discovery motion to this court. Coleman never presented such a motion. After oral argument on the motions, this court dismissed Coleman's petition and denied his motion for an evidentiary hearing on December 6, 1988. *Coleman v. Thompson*, No. 88–0125–A (W.D.Va. filed Dec. 6, 1988). In that opinion, this court held that while Coleman's default on the state habeas proceedings barred federal relief, his claims were also meritless. This court painstakingly examined each of Coleman's *Brady* claims, and found that Coleman's trial attorneys had complete access to the prosecutor's file before the trial. Additionally, this court maintained that even if a particular item of evidence had been disclosed, such disclosure would not have altered the verdict. This court also found sufficient constitutional evidence of Coleman's guilt to support the verdict. *Id.*

Coleman appealed this decision to the United States Court of Appeals for the Fourth Circuit. After appealing, the circuit court granted Coleman's petition for permission to have "PCR–DNA" testing performed on evidence obtained from the crime scene. The Fourth Circuit then affirmed this court's ruling that Coleman's claims were barred by his procedural default in the state habeas proceeding and concluded that his death sentence was constitutional. The court also held that Coleman's claims did not fall within the "actual innocence" exception of the federal procedural default rule. *Coleman v. Thompson*, 895 F.2d 139 (4th Cir.1990).

On his third attempt, the Supreme Court of the United States granted his petition for a writ of certiorari. *Coleman v. Thompson*, ⸺ U.S. ⸺, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). The Court, however, affirmed the Fourth Circuit's ruling that Coleman's claims were barred by procedural default in the state habeas proceeding. *Coleman v. Thompson*, ⸺ U.S. ⸺, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Court also noted that Coleman did not argue "that federal review of his claims is necessary to prevent a fundamental miscarriage of justice...." 111 S.Ct. at 2568. Coleman petitioned the Court for a rehearing which was denied on September 13, 1991. *Coleman v. Thompson*, ⸺ U.S. ⸺, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991).

Three weeks before the hearing to set his execution date, Coleman filed a successive habeas petition in the Circuit Court of Buchanan County. After oral argument, the court granted the Commonwealth's motion to dismiss and entered final judgment on December 20, 1991. The court found Coleman's claims were barred by Va.Code Ann. § 8.01–654(B)(2) (Michie 1984), and that his claims of new evidence were not cognizable in habeas corpus. On February 12, 1992, the circuit court scheduled Coleman's execution for May 20, 1992.

On March 5, 1992, Coleman petitioned for appeal to the Virginia Supreme Court. The court refused the petition and found that Coleman's claims were barred under

§ 8.01–654(B)(2) and that "his allegations of 'newly discovered' evidence [were] not cognizable in habeas corpus." (Respondents' Exh. 3). He then petitioned this court for a "Writ of Habeas Corpus Alleging Actual Innocence." Respondents filed a motion to dismiss, and this court heard oral arguments on May 6, 1992.

## DISCUSSION

### I.

As shown by the procedural history, this is the twelfth round of a murder case that began eleven years ago on Slate Creek in Buchanan County, Virginia. Wanda McCoy was brutally raped and murdered with a slash to her throat and two additional stab wounds to her chest. Presently pending before this court is Roger Keith Coleman's second habeas petition in which he now alleges he is "actually innocent." While the court will not recite all the facts elicited at the original trial, there are some facts that are essential to the resolution of this case.[1] Coleman's attorney argued at the hearing on May 6, 1992 that these facts constitute "newly discovered evidence" of "actual innocence."

At the original trial, Coleman's cell mate, Roger Matney, testified that Coleman confessed to being at the scene of the crime and to raping the victim. Matney described a floor plan of the house which Coleman had drawn for him and mentioned a paper towel which police found by the victim's body. Coleman's new evidence on this issue consists of an affidavit signed by Matney's mother-in-law in which she stated that Matney had recanted his former testimony. (Petitioner's State Exh., R). Matney, however, stands by his trial testimony. (Respondents' State Exh. 24).

Coleman also claims, as additional new evidence of "actual innocence," that Matney was offered reduced time on charges that were pending against him in exchange for his testimony against Coleman. Cole-

man's trial attorney, Terry Jordan, stated that he knew Matney was to receive a reduced sentence for his testimony and questioned Matney about the deal at the original trial. (Respondents' Exh. 5).

Coleman also claims that a former officer of the Grundy Police Department, Frank Hinkle, was unjustly accused of accepting bribes and fired because he knew of the deal with Matney. Hinkle arrested Matney who then informed Hinkle that he would not have to go to jail because he had performed a favor for Chief Deputy Sheriff Randall Jackson. According to Hinkle, Matney was released from custody the next day. (Petitioner's Exh. 4). Officer Jackson did not remember Hinkle arresting Matney for drunk driving, stated that the jail records did not show Matney was incarcerated on those dates, and denied releasing him from jail. (Respondents' Federal Exh. 16).

Through his new evidence, Coleman seeks to implicate Donald and Michael Ramey as the murderers in this case. Teresa Horn stated on September 11, 1990, that Donald Ramey attempted to attack her sexually in March or April 1987. During the course of the attack, Ramey told her "to shut up and quiet down, [or] he [would] ... do [her] like he did that girl on Slate Creek." (Petitioner's Exhibit 44 at 2). Horn stated she spoke with Ramey later and he admitted killing the girl on Slate Creek. *Id.* at 3. Horn told her story to a television crew and died of a drug overdose the next day, March 6, 1992.[2] Affidavits from Kennith Clevinger (Petitioner's Exh. 46), dated September 15, 1990, and Brenda K. Keene (Petitioner's Exh. 47), dated April 16, 1992, indicate that Horn told them of the attack and what Ramey said to her.

However, Mark Helton was present during the alleged attack and stated that Donald Ramey did not attempt to rape Horn. In fact, Helton stated that Horn took her own clothes off and she and Ramey went into the bedroom. Helton denied hearing

---

**1.** An extensive recitation of the facts in the original trial is contained in the Virginia Supreme Court opinion. *Coleman v. Commonwealth,* 226 Va. 31, 307 S.E.2d 864 (1983).

**2.** The autopsy report listed the cause of death as "[c]erebral and pulmonary edema *due to* ingestion of multiple drugs." (Respondent's Exhibits No. 7).

Donald Ramey confess to the murder on Slate Creek. (Respondents' State Court Exh. 12).

Also contradicting Horn's statement was an acquaintance, Linda Mullins, who stated that she believed Horn was speaking with Coleman's attorneys to get attention. Ms. Mullins also stated that Horn told her that "Roger Coleman could come into a lot of money if he came out of this thing and he may want to share it when he gets out." (Respondents' Exh. 8).

Additionally, Harold Douglas Smith allegedly stated that Donald Ramey confessed to McCoy's murder at a party. Investigator James McCloskey attempted to obtain a sworn affidavit to this effect, but Smith refused to sign it. Smith did sign an affidavit stating that he was at a party with several other people, smoking marijuana. Someone knocked on the door and pushed it open "about six inches." (Respondents' Exh. 9 at 5). One of the people in the bathroom pushed the door shut and "a voice called out from the hallway, 'If you don't let me in, the same thing will happen to you that happened on Slate Creek.'" Id. Smith stated that the speaker's voice was slurred because of too much alcohol and he "could not determine who made the statement." Id.

Coleman also claims that bloody sheets, two men's Van Heusen western cowboy shirts, scissors, a silver flashlight, and a Big Ben white alarm clock are new evidence of actual innocence. According to Nell Shortridge, these items were found in a trash bag in the back of her husband's truck one to three days after the murder. Nell Shortridge in an affidavit dated December 19, 1991, stated that she called Aubrey Ratliff, Sheriff of Buchanan County, and told him they discovered these items, but she did not mention the scissors.[3] (Respondents' Exh. 63). Mr. Shortridge, in his affidavit, stated that scissors were found along with the aforementioned items. (Petitioner's State Exh., H at 2).

Mrs. Shortridge stated the Sheriff told her that he was not investigating the murder and would not come and get them. (Respondents' Exh. 63). Sheriff Ratliff, however, denied receiving such a phone call. (Respondents' State Court Exh. 23). Mr. Shortridge then buried the sheets but does not remember where he put the scissors and flashlight. He "put the clock on a rock at the mine." (Petitioner's State Exh., H at 2). Trial attorney, Terry Jordan, stated he knew of the sheets and other items before the trial, but "considered the information useless" because of Mrs. Shortridge's mental problems. (Respondents' Exh. 5). Mr. Shortridge confirmed that his wife was suffering from a mental disorder and possibly drug addiction during this period. (Respondents' Exh. 10). One piece of a sheet was extracted from the ground, but perhaps because of decay, no semen or blood was found. No further excavation and testing occurred although it was recommended. (Respondents' Exh. 65).

Coleman also claims that the reports of scientists contradicting his own expert, Edward Blake, are new evidence of "actual innocence." However, when Coleman's counsel petitioned the circuit court for an order allowing "PCR–DNA" testing to be performed, they argued that Blake was an expert scientist in the area of "PCR–DNA" testing and in the interpretation of its results. In a report dated November 7, 1990, Blake reported that he found three types of alleles in the sperm samples taken from the victim's vagina, 1.3, 2, and 4, and paired two alleles to conclude that Coleman could not be eliminated as the primary donor of the sperm. Such particular genotype is found only in 2% of the population. (Petitioner's Exh. 26). Additionally, evidence showed that Coleman and the primary donor had ABO blood type B, which occurs in 10% of the population. When combined with the "PCR–DNA" testing, the ABO narrows the percentage of the population

---

**3.** Dr. Oxley, Deputy Chief Medical Examiner for the Western District who performed the autopsy on Wanda McCoy, opined that the "victim's wounds could not have been inflicted with a pair of scissors. The slash wound to the victim's neck and the two stab wounds all had sharp margins and in my opinion scissor blades are not sharp enough to have caused such wounds." (Respondent's State Exhibits, No. 20).

with these characteristics to .2%. (Respondents' State Court Exh. 31).

Coleman now wishes to challenge his own expert through other experts who say Blake performed tests and made assumptions which are not scientifically accepted at this time. Coleman's second expert, Dr. Bruce Kovacs, stated that the scientific technology in this area is not sufficiently advanced to allow the pairing of the two alleles in order to determine a primary and secondary donor. Dr. Kovacs noted that Brad McCoy's alleles were 1.1, 4. Therefore, he opined that the absence of the 1.1 allele, the fact that the victim's husband stated they had not had intercourse for two days prior to the murder, and her intervening menstrual cycle,[4] excluded Brad McCoy as the source of the semen. Thus, Dr. Kovacs concluded that "there is a strong likelihood that more than one person participated in the rape and murder of Wanda McCoy."[5] (Petitioners' Exh. 66). Additionally, Dr. Eric Lander questioned Dr. Blake's pairing of the alleles and requested the scientific documentation. (Petitioner's Federal Exh., Nos. 67, 68).

Subsequent testing by Dr. Blake, however, showed there was "a faint indication that the '1.1' allele was present." (Respondents' Exh. 11). Thus, Dr. Blake opined that the secondary donor's genotype could have been "1.1, 4," matching Brad McCoy. This is simply a possibility, as the "1.1" allele could be that of the victim, whose genotype was "1.1, 1.2." *Id.*

Coleman also argued that a pry mark on the door of the victim's home and a fingerprint on the window sill are new evidence that was previously withheld from defense counsel. This argument has no merit since these allegations were part of the *Brady* claims raised in the first habeas, and were dismissed.

Coleman also claimed that his wife misstated a crucial fact at the trial when she testified that their cat had not scratched anyone to cause bleeding. Coleman offered the affidavit of Tina McNutt who stated that, on different occasions while visiting Coleman and his wife, the cat scratched her and her baby son, causing them to bleed. (Petitioners' Exh. 21). Coleman claimed that the blood on his jeans was caused by the cat scratching him or someone else. However, type O blood was found on his jeans, and Coleman's blood type is B. The victim's blood type was O.

At oral argument Coleman did not assert that evidence of a conflict of interest on the part of Terry Jordan, Coleman's original trial attorney, was new evidence. It was, however, alleged in Coleman's "Memorandum in Opposition to Motion to Dismiss and in Support of Motion for Evidentiary Hearing." Coleman points to an arrest warrant which shows that Matney was originally charged with "assault [and] batter[y of] Albert Ray Lester by tieing a sheet around his neck with intent to maim, disable or kill." (Petitioners' Exh. 35) The charge was, however, amended to the reduced charge of assault and battery. The offense occurred on April 10, 1981, while Matney was imprisoned at the Buchanan County Jail. The warrant shows that his attorney for this charge was Jordan. Matney's original hearing date was April 14, 1981. The warrant, however, also shows that this hearing was continued until July 16, 1981. Coleman argues that this was a conflict of interest on behalf of his attorney. He also claims that this information, in addition to information that the prosecutor reduced or dismissed approximately three charges against Matney before Coleman's trial and three after the trial, should have been used by his attorney to impeach Matney's credibility. (Petitioner's Memorandum at 11).

## II.

Because this is Coleman's second federal habeas corpus petition, the court must determine whether it can reach the merits of his claims. *See* 28 U.S.C. § 2244;

---

4. Dr. Oxley stated there was "no gross evidence that the victim had been menstruating at the time of her death." (Respondent's State Exhibits, No. 20).

5. Coleman also argues that the presence of semen in the anal cavity supports the theory that two people raped and murdered McCoy.

Rule 9(b) of Rules Governing Section 2254 Cases. Respondent moved, pursuant to Rule 5 of Rules Governing Section 2254 Cases, to dismiss this successive petition. A review of cases dealing with procedural default, successive petitions, abuse of the writ, and their interplay with a claim of "actual innocence" is instructive since the state has a legitimate interest in preventing Coleman from using the writ as a delay tactic.

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640 (1991) (prisoner defaulted his entire state collateral appeal by missing the filing deadline); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (defense counsel inadvertently failed to raise a substantive claim of error on appeal). In discussing cause for a procedural default, the *Murray* Court indicated that whether the attorney erred or the kind of error was not determinative.

> So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland v. Washington* [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default. Instead, we think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.

*Id.* 477 U.S. at 488, 106 S.Ct. at 2645. But the Court also recognized "that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.* at 496, 106 S.Ct. at 2649.

When a prisoner files a habeas petition involving claims that have already been found meritless in a prior petition, i.e. a successive petition, *Kuhlmann v. Wilson,* 477 U.S. 436, 444 n. 6, 106 S.Ct. 2616, 2622, n. 6, 91 L.Ed.2d 364 (1986) (plurality opinion), "the 'ends of justice' require federal courts to entertain such petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Id.* at 454, 106 S.Ct. at 2627; *see also McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Likewise, when a prisoner presents a claim for the first time in a second petition for a writ of habeas corpus, i.e. an abuse of the writ, *Kuhlmann,* 477 U.S. at 444 n. 6, 106 S.Ct. at 2622 n. 6, "[t]o excuse his failure to raise the claim earlier, he must show cause for failing to raise it and prejudice therefrom.... The petitioner's opportunity to meet the burden of cause and prejudice will not include an evidentiary hearing if the district court determines as a matter of law that petitioner cannot satisfy the standard." *McCleskey,* 111 S.Ct. at 1470. The *McCleskey* Court nevertheless held intact the exception for a petitioner's failure to show cause "when a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.* Finally, the Court just recently in *Keeney v. Tamayo–Reyes,* —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), extended the cause and prejudice requirement to a prisoner's failure to develop facts in a state proceeding and held that a prisoner is "entitled to a federal evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure." *Id.* at ——, 112 S.Ct. at 1721. The Court again adopted the "narrow exception to the cause-and-prejudice requirement: A habeas petitioner's failure to develop a claim in state-court proceedings will be excused and a hearing mandated if he can show that a fundamental mis-

carriage of justice would result from failure to hold a federal evidentiary hearing." *Id.*

It is this "fundamental miscarriage of justice" or "actual innocence" exception which Coleman now claims entitles him to habeas corpus relief. The *Kuhlmann* plurality articulated a standard for determining "factual" or "actual innocence:"

> [T]he prisoner must 'show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.' ... Thus, the question whether the prisoner can make the requisite showing must be determined by reference to *all* probative evidence of guilt or innocence.

*Kuhlmann,* 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 160 (1970)).

This exception applies not only to the guilt phase of a trial but has also been extended to the sentencing phase in capital cases. In *Smith v. Murray,* 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), the Court acknowledged "that the concept of 'actual,' as distinct from 'legal,' innocence does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Id.* at 537, 106 S.Ct. at 2668. Nonetheless, the Court, assuming that a psychiatrist's testimony should not have been presented to the jury during the sentencing phase, found that "its admission did not serve to pervert the jury's deliberations concerning the ultimate question whether *in fact* petitioner constituted a continuing threat to society." *Id.* at 538, 106 S.Ct. at 2668. Adhering to the view that a habeas petitioner's showing of "actual innocence" occurs only in an extraordinary case, the Court in *Dugger v. Adams,* 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), criticized the dissent's

argument that a fundamental miscarriage of justice occurs whenever "there is a substantial claim that the constitutional violation undermined the accuracy of the sentencing decision." *Id.* at 410, 109 S.Ct. at 1215. The Court stated that "[d]emonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received." *Id.* at 412 n. 6, 109 S.Ct. at 1218 n. 6.

■ "Actual innocence" must not be confused with prejudice. A showing of actual prejudice without a showing of cause does not entitle a habeas petitioner to relief, *See Murray,* 477 U.S. at 495, 106 S.Ct. at 2649, and if cause is not established, a court need not consider whether a petitioner was in fact prejudiced. *McCleskey,* 111 S.Ct. at 1474–75. "Actual innocence" is the narrow exception that excuses a showing of cause and prejudice, but it "requires more than showing a constitutional error, even one that results in the admission of false or misleading facts, and even if the verdict or sentence would have been different absent the error." *Sawyer v. Whitley,* 945 F.2d 812, 818 (5th Cir.1991) *cert. granted,* — U.S. ——, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991).

Turning to the present case, the court finds that Coleman has not made a colorable showing of "actual innocence" that would entitle him to an evidentiary hearing or to habeas corpus relief. All of Coleman's evidence which he claims is new and shows his "actual innocence" does nothing more than attack the credibility of witnesses and evidence at the original trial. For example, the affidavit from Teresa Horn implicating Donald Ramey as the murderer is contradicted by Ramey and Linda Mullins who stated that Horn admitted before her death that she made these statements in the expectation of financial gain if Coleman is released. The other affiants who stated that Horn told them about Ramey's attack on her and his admissions about the McCoy murder are contradicted by Mark Helton. Even putting aside the serious

questions about the admissibility of any of these statements since Horn is now deceased and many contain double hearsay, they do not establish Coleman's "actual innocence." If all of this evidence had been offered at trial, it would have raised nothing more than credibility questions which the jury could still have resolved against Coleman when considering *all* the probative evidence. *See Kuhlmann,* 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17.

The alleged recantation by Matney falls into the same category. He stands by his trial testimony, and the statements by other people that he has since admitted that he testified falsely to gain deals on his criminal charges do nothing more than attack his credibility. Moreover, even if Matney actually recanted his testimony, that alone does not warrant habeas corpus relief. *Smith v. Wainwright,* 741 F.2d 1248, 1257 (4th Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985).

Contrary to Coleman's assertion, the results of the "PCR–DNA" testing by Dr. Blake do not show his "actual innocence" but significantly bolster's the jury's finding of guilt. At trial, the ABO testing established that the blood type of the semen found in Wanda McCoy was Type B, that Wanda McCoy's blood type was O, and that Coleman's blood type was B. This placed Coleman within 10% of the population of possible perpetrators of the crime. With the "PCR–DNA" results, that percentage has been narrowed to .2%. Coleman now offers affidavits from other experts who question Blake's interpretation of the test results, especially the part that indicated the presence of sperm from a second donor whom Blake opined was McCoy's husband. But it must be remembered that Coleman selected Blake and attested to his credibility when he asked the Circuit Court of Buchanan County to allow him to have this testing performed. If the results had excluded Coleman as a possible perpetrator, no doubt he would be applauding Blake's results and reputation. It is almost always possible to find expert witnesses who disagree. *See Waye v. Murray,* 884 F.2d 765, 767 (4th Cir.1989). Nonetheless, if all the experts' opinions are accepted, at best only a credibility question is left, and if Blake's opinion is not accepted, then the evidence remains as it was at the original trial. In either situation, Coleman has not shown his "actual innocence." If valid "PCR–DNA" results had excluded Coleman as a possible perpetrator, this court would consider such evidence adequate to demonstrate "actual innocence."

Coleman also argues that the presence of sperm from two donors and sperm in the anal cavity precludes capital punishment for him since Virginia allows such punishment only for the actual perpetrator of the murder. The court does not find that Coleman is "actually innocent" of the sentence he received. *See Dugger,* 489 U.S. at 412 n. 6, 109 S.Ct. at 1218 n. 6.

The situation is not changed when considering the affidavits about the bloody sheets, the two shirts, the scissors, the cat scratch, the pry mark, and the latent fingerprint. All of this evidence turns upon the credibility of witnesses. Even if the court accepts as true that neighbors of McCoy found the sheets, shirt, and scissors a few days after the incident, their relevance is questionable since there is no evidence that any sheets were missing from the McCoy house, and Dr. Oxley excluded scissors as a possible murder weapon. None of these items even suggest Coleman's "actual innocence."

■ It must be remembered that "actual innocence" is something more than a showing that the verdict might have been different. *Sawyer,* 945 F.2d at 818. Coleman asks the court to consider the cumulative effect of all his alleged new evidence as the court did in *Derden v. McNeel,* 938 F.2d 605 (5th Cir.1991). The result is still not "actual innocence" but only the recognition that the jury might have, but not necessarily, reached a different result.

■ Having concluded that Coleman has not made even a colorable showing of "actual innocence," the court must still consider whether he has shown cause and prejudice for not having raised the present claims in prior proceedings or for asking the court to consider again claims previous-

ly decided, for example the *"Brady"* claims about the pry mark and the latent fingerprint. Again, the court finds that he is not entitled to relief.

■ All of Coleman's present constitutional claims were raised in his second state petition. The Supreme Court of Virginia upheld the circuit court's finding that the claims were procedurally barred under Va. Code Ann. § 8.01–654(B)(2) (Michie 1984). This section states that "no writ shall be granted on the basis of any allegation the facts of which petitioner had knowledge at the time of filing any previous petition." *Id.* This holding is "a factual finding with regard to prior knowledge, and it [is] entitled to a presumption of correctness from the federal district court." *Clanton v. Muncy,* 845 F.2d 1238, 1241 (4th Cir.), *cert. denied,* 485 U.S. 1000, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988). Consequently, this procedural default under Virginia law bars collateral review of these claims by this court. *Id.*

Under *Coleman,* 111 S.Ct. at 2551, and *Murray,* 477 U.S. at 496, 106 S.Ct. at 2649, Coleman can still obtain federal habeas review despite the procedural default if he shows cause and prejudice. However, this ruling by the Supreme Court of Virginia establishes factually either that Coleman knew of his present claims when he filed his previous habeas petitions or that the claims were reasonably available to him. *See, Clanton,* 845 F.2d at 1241. Therefore, "[t]he nature of the procedural default found by the state court removes the possibility that [Coleman can] establish the 'cause' required to raise a defaulted claim." *Clanton,* 845 F.2d at 1241. Without a showing of cause, the court is not required to address whether Coleman was in fact

prejudiced. *McCleskey,* 111 S.Ct. at 1474–75.

Relying upon the decision in *Becton v. Barnett,* 920 F.2d 1190 (4th Cir.1990), Coleman also argues that material facts are in dispute and that he is therefore at least entitled to an evidentiary hearing in which to establish cause and prejudice. However, in *Becton,* the petitioner had never received an evidentiary hearing in state court, and he was presenting his claims for the first time in federal court. In this case, the court finds as a matter of law that Coleman cannot show cause and prejudice, and he is therefore not entitled to an evidentiary hearing. *McCleskey,* 111 S.Ct. at 1470.[6]

## CONCLUSION

"It is not appropriate that these claims, all of which are barred by well-established doctrine, would be thrust upon the courts and opposing counsel at the last minute. Nonetheless, any capital case is a matter of the utmost gravity and, even at the eleventh hour, a court must once again assure itself that no fundamental miscarriage of justice is taking place." *Peterson v. Murray,* 949 F.2d 704, 705 (4th Cir.1991). For the reasons stated, the court concludes that respondents' motion to dismiss should be granted. The court is satisfied that no "fundamental miscarriage of justice" is occurring. Coleman is neither "actually innocent" of the rape and murder nor of the sentences he received.

In this court's opinion rendered on December 6, 1988, which laid aside all technical and legal arguments, this court found the evidence presented at trial sufficient to find Coleman guilty beyond a reasonable doubt. After a review of the alleged "new evidence," this court finds the case against Coleman as strong or stronger than the

---

**6.** Coleman also relies upon the writ of certiorari granted in *Herrera v. Collins,* — U.S. ——, 112 S.Ct. 1074, 117 L.Ed.2d 279 (1992), to argue that he is entitled to a hearing on his claim of "actual innocence." The questions presented in the Petition for Writ of Certiorari were:

1. Does it violate the Eighth and Fourteenth Amendments to execute a person who has been convicted of murder but who is innocent?

2. If so, must state courts provide a meaningful mechanism for hearing claims of actual innocence in death penalty cases?

3. What procedures are necessary in federal court for adjudicating claims of actual innocence in a death penalty case?

This court has fully considered Coleman's claim of "actual innocence" and perceives no reason to grant a hearing or delay this decision just because the Supreme Court granted a writ of certiorari in *Herrera.*

evidence adduced at trial. Most of the "new evidence" is either irrelevant, of no probative value, or hearsay and thus not admissible in a court of law. As to any "new evidence" which is admissible, it would only produce disputed facts and is totally insufficient to establish "actual innocence."

In addition, his present petition is successive and abusive. The claims are procedurally barred, and the nature of the factual findings by the Supreme Court of Virginia preclude a showing of cause for the procedural bar. An appropriate order will be entered this day.