PRESENT: Carrico, C.J., Lacy, Hassell, Keenan, Koontz, and
Lemons, JJ., and Compton, S.J.

THE GLOBE NEWSPAPER COMPANY,
d/b/a THE BOSTON GLOBE

v.   Record No. 012682

COMMONWEALTH OF VIRGINIA                          OPINION BY
                                          JUSTICE DONALD W. LEMONS
THE WASHINGTON POST, ET AL.                    November 1, 2002

v.   Record No. 012683

COMMONWEALTH OF VIRGINIA

                 FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
                          Keary R. Williams, Judge

     Twenty-one years after the rape and murder of Wanda McCoy,

twenty years after the trial of Roger Keith Coleman for these

offenses, and ten years after his execution, we consider whether

the trial court erred in refusing petitions by several

newspapers for access to DNA evidence for the purpose of re-

testing the evidence.

                    I.  Facts and Procedural History

     In 1982, Roger Keith Coleman ("Coleman") was tried by a

jury in the Circuit Court of Buchanan County and was convicted

of the rape and capital murder of Wanda McCoy.  For the rape, he

was sentenced to confinement in the penitentiary for life, and

for the capital murder, he was sentenced to death.  We affirmed

the convictions and the sentences.  See Coleman v. Commonwealth,

226 Va. 31, 307 S.E.2d 864 (1983), cert. denied, 465 U.S. 1109

(1984).  Coleman sought review of his convictions by various

petitions for writs of habeas corpus[1] and a final application for

a stay of execution to the Supreme Court of the United States,

which was denied.  See Coleman v. Thompson, 504 U.S. 188 (1992).

In accordance with the order of the Circuit Court of Buchanan

County, he was executed in 1992.

The pretrial investigation of the rape and murder of Wanda

McCoy resulted in collection of biological material including

spermatozoa collected from the vagina of the victim.  In 1982,

DNA testing of this material was not available.  Elmer Gist,

Jr., a forensic serologist employed by the Commonwealth,

testified at trial concerning comparison of hair samples and

blood typing tests.  Summarizing Gist's testimony, we stated in

our opinion upon direct appeal of Coleman's conviction that

> two apparently foreign hairs found in
> Wanda's pubic area were, in fact, not those
> of the victim but were consistent with pubic
> hair samples taken from Coleman. . . .
> Gist testified that Coleman was a
> secretor, one whose "blood type factor" is
> present "in semen, saliva or other body
> fluids," and that 80% to 85% of the
> population are secretors.  Gist determined

---

[1] See Coleman v. Bass, 484 U.S. 918 (1987) (denying a petition for a writ of certiorari to the Supreme Court of Virginia's Order denying a petition for a writ of habeas corpus); Coleman v. Thompson, 895 F.2d 139 (4th Cir. 1990) (affirming the judgment of the district court denying a writ of habeas corpus), aff'd, 501 U.S. 722 (1991); Coleman v. Thompson, 798 F. Supp. 1209 (W.D. Va. 1992) (denying Coleman's second appeal for a federal writ of habeas corpus), aff'd, No. 92-4005, 1992 U.S. App. LEXIS 11440 (4th Cir. May 18, 1992) (per curiam).

> that Coleman had Type B blood, a rare type
> possessed by only 10% of the population.
> Wanda's blood was type O, a type which 40%
> to 45% of the population have; her husband's
> was Type A.  From Gist's examination of the
> vaginal specimen taken from the victim's
> body he found that spermatozoa had been
> deposited in her vagina by a secretor with
> Type B blood.  He also determined that a
> bloodstain on Coleman's blue jeans was made
> by Type O human blood.

Coleman v. Commonwealth, 226 Va. at 38-39, 307 S.E.2d at 867-68.

Additional evidence against Coleman is summarized in our opinion affirming his convictions and includes testimony from a fellow inmate that Coleman had "described for him the killing and rape of the victim."  Id. at 39, 307 S.E.2d at 868.

Eight years after his conviction, Coleman petitioned the trial court to permit DNA testing of the biological material. The trial court, over the objection of the Commonwealth, granted Coleman's petition, but required that a portion of the material be preserved for testing by the Commonwealth.  The tests ("PCR-DNA" testing) were conducted by Dr. Edward T. Blake ("Dr. Blake"), of Forensic Science Associates in Richmond, California. The test results did not exclude Coleman and 2% of the Caucasian population as the source of the biological material.  The trial court ordered that physical custody of the remaining biological material remain with Dr. Blake until further order of the court. Later, evidence offered at a hearing on a second petition for habeas corpus in the federal courts utilized the results of the

"PCR-DNA" testing and the ABO blood type testing.  The court stated that the "evidence showed that Coleman and the primary donor had ABO blood type B, which occurs in 10% of the population.  When combined with the "PCR-DNA" testing, the ABO narrows the percentage of the population with these characteristics to .2%."  Coleman v. Thompson, 798 F. Supp. 1209, 1213-14 (W.D. Va. 1992).  The United States District Court for the Western District of Virginia concluded that the additional testing "significantly bolster[s] the jury's finding of guilt."  Id. at 1217.

On July 26, 2000, eight years after Coleman's execution, Dr. Blake informed the trial court by letter that a more sophisticated testing procedure was available that had been unavailable at the time of the tests conducted in 1990.  According to Dr. Blake, an analysis "on the remaining half of the DNA preparation from the Wanda McCoy vaginal slides could resolve any lingering factual issues concerning the source or sources of the spermatozoa in this case."

Subsequently, The Globe Newspaper Company, d/b/a The Boston Globe, The Washington Post, The Virginian-Pilot, and Media General Operations, Inc., d/b/a The Richmond Times-Dispatch (collectively, "the newspapers") filed petitions in the Circuit Court of Buchanan County, requesting the trial court "to permit testing of certain evidence involved in the case of Commonwealth

4

v. Coleman and for access to the test results." The newspapers based their request upon the Virginia Freedom of Information Act ("VFOIA"), recodified in 2001 as Code §§ 2.2-3700 through -3714,[2] the "public's right to know and the media's right of access" pursuant to the First Amendment to the United States Constitution ("First Amendment"), Article I, Section 12 of the Constitution of Virginia, and Code § 19.2-270.4.

The trial court, by order entered September 4, 2001, incorporating its letter opinion of May 31, 2001, denied the petitions holding that the newspapers did not have "standing on the grounds asserted under the First Amendment and Virginia Constitution on which to pursue a cause of action requesting public access to the DNA evidence at issue for the purpose of scientific re-testing." Additionally, the trial court held that Code § 2.2-3706(F)(1) provided it with discretion to disclose certain information, but concluded that "it would not be in its sound discretion to order re-testing of the Coleman DNA on the basis of the VFOIA." The newspapers appeal the judgment of the trial court.

II. Analysis

---

[2] The newspapers based their VFOIA claim on Code § 2.1-342.2(F), which was recodified in 2001 as Code § 2.2-3706(F)(1). For convenience of reference, the current Code designation will be used in this opinion.

5

Relying upon the First Amendment and Article I, Section 12 of the Constitution of Virginia, the newspapers maintain that the trial court erred in holding that they had no standing to petition for access to and re-testing of the DNA evidence in question, and in denying their petitions. Additionally, the newspapers maintain that the trial court erred in failing to exercise its discretion under VFOIA, Code § 2.2-3706(F)(1), because the compelling public interest to know the results of the DNA testing "greatly outweighs" any state interest in preventing the testing.

The Commonwealth argues that the newspapers are not seeking access to judicial proceedings or documents, but are seeking the ability to conduct scientific testing on evidence from a criminal trial. Accordingly, the Commonwealth maintains that neither the First Amendment nor Article I, Section 12 of the Constitution of Virginia, is applicable to this case. Among other arguments, the Commonwealth asserts that the biological material at issue in this case does not constitute "public records" under VFOIA. We agree with the Commonwealth.

### A.  First Amendment and Virginia Constitutional Claims

The trial court and the parties have framed the constitutional questions in terms of "standing." Unfortunately, that analysis is not helpful in the present case and context.

6

The Commonwealth and the newspapers agree that the press has a right of "access" to criminal trials under the First Amendment and Article I, Section 12 of the Constitution of Virginia. This controversy is about the definitional reach of the concept of "access."

The right of access to judicial proceedings and records is well-established. In Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 (1980), the Supreme Court of the United States held that the public's right to attend criminal trials was "implicit in the guarantees of the First Amendment." Similarly, in Richmond Newspapers, Inc. v. Commonwealth, 222 Va. 574, 585, 281 S.E.2d 915, 921 (1981) (quoting Richmond Newspapers, Inc., 448 U.S. at 581), relying upon Article I, Section 12 of the Constitution of Virginia, we held that "[a]bsent an overriding interest . . . [pretrial hearings] must be open to the public." The press does not have a right of access greater than the public at large under the First Amendment, Nixon v. Warner Communications, Inc., 435 U.S. 589, 609 (1978), or under Article I, Section 12 of the Constitution of Virginia. The right of access is not limited to attendance at criminal proceedings. Under certain circumstances and with qualifications, it extends to inspection of documents filed in connection with such proceedings. In re Washington Post Co. v. Soussoudis, 807 F.2d 383, 390 (4th Cir. 1986).

7

None of the proceedings in the criminal case against Roger Keith Coleman was closed to the public or the press. No one has suggested that access to evidence presented at trial or post-trial proceedings has been denied. As the term has been used in every case cited to us by the newspapers, "access" has not been denied. What the newspapers seek to do in this case is expand the definition of "access" to include the right to conduct independent testing of evidence in criminal proceedings.[3] The newspapers have been given access to the DNA test results from the post-trial proceedings. What the newspapers want is the ability to cause the biological material to be re-tested and generate a new scientific report, thereby altering, manipulating, and/or destroying existing evidence in order to create new evidence. Historically, the constitutional right of the public and the press to have access to criminal proceedings has applied to hearings and trials and inspection of documents and records that have been introduced at such proceedings. Here, the newspapers seek "access" to something that does not exist, namely, new evidence in the form of new test results. No appellate decision of any court, state or federal, is cited by

---

[3] While the biological material was not introduced into evidence at the criminal trial, the trial court permitted the results of DNA testing of the material to be introduced in a post-trial proceeding prior to Coleman's execution.

the newspapers in support of such a novel extension of the concept of access.

The newspapers urge this Court to employ the test articulated in <u>Press-Enterprise Co. v. Superior Court,</u> 478 U.S. 1 (1986). In <u>Press-Enterprise Co.</u>, the Supreme Court considered the exclusion of the public and press from a preliminary hearing in a criminal case and the denial of requests for transcripts of the proceedings. <u>Id.</u> The Court stated the following:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a "tradition of accessibility implies the favorable judgment of experience," we have considered whether the place and process have historically been open to the press and general public.
>
> . . . .
>
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process in question. . . .
> . . . If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. . . . "[T]he presumption may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest."

<u>Id.</u> at 8-9 (internal citations omitted).

9

It is obvious from the opinion that the definition of "access" does not include the right of the public at large or the press to subject evidence in a criminal case to testing. Even if the "place and process" language in Press-Enterprise Co. could be stretched to include the right to test the evidence, the newspapers' argument would fail the subsequent analysis.

Certainly, the right to test evidence in a criminal case has not been historically extended to the press and general public. Indeed, the newspapers concede that except for an isolated trial court decision in Georgia,[4] they know of no case that has ever permitted such testing.

Additionally, expanding the reach of the right of "access" to include the right of the public and press to test evidence in a criminal trial could not be restricted in any principled way to only cases in which a death sentence has already been imposed. The practice, if permitted, would logically apply to all criminal proceedings. It does not take much imagination to envision requests for "access" to test substances alleged to be illegal or weapons alleged to have been used in assaults. When the items to be tested are limited in quantity or subject to destruction when tested, how would a court supervise such testing? How would competing claims of rights to "access" be

_____

[4] See In Re: Request for Inspection and Testing of Evidence in Connection with Criminal Action No. 12405, No. 2000 V 67049

10

handled when quantity or integrity of the items are an issue?
We have no difficulty concluding that permitting testing of this
type would not play "a significant positive role in the
functioning" of the judicial process.

We conclude that the newspapers have no right under the
First Amendment or Article I, Section 12 of the Constitution of
Virginia to obtain the biological material in question and
subject it to re-testing.

### B. Virginia Freedom of Information Act

The trial court discussed the specific provisions of VFOIA
concerning criminal investigations or prosecutions in Code
§ 2.2-3706(F)(1) in its opinion letter, and stated, "the Court
finds that it would not be in its sound discretion to order re-
testing of the Coleman DNA on the basis of the VFOIA." The
trial court also held that the newspapers had no standing to
make such a request under the VFOIA. The Commonwealth argues
that the request for testing of the biological material does not
involve a "public record." We agree with the Commonwealth.

Under the VFOIA, persons have a right to inspect and copy
certain "public records." Code § 2.2-3704. "Public records"
are defined in Code § 2.2-3701 as

> all writings and recordings that consist of
> letters, words or numbers, or their
> equivalent, set down by handwriting,

---

(Houston County Super. Ct., Ga., July 28, 2000).

11

> typewriting, printing, photostatting, photography, magnetic impulse, optical or magneto-optical form, mechanical or electronic recording or other form of data compilation . . . prepared or owned by, or in the possession of a public body or its officers, employees or agents in the transaction of public business.

Clearly, the biological material recovered on swabs from the vagina of the victim does not meet the test of a "public record." Even if it did, the VFOIA allows for inspection and copying, not testing.

For the reasons stated we will affirm the judgment of the trial court.

Affirmed.