UNPUBLISHED

# COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges O'Brien and AtLee
Argued at Richmond, Virginia


TAIVEON ANTIONIO TUCKER

v.      Record No. 0301-19-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
APRIL 21, 2020


FROM THE CIRCUIT COURT OF HENRICO COUNTY
James S. Yoffy, Judge

John G. LaFratta (Main Street Law Offices, on brief), for appellant.

Craig W. Stallard, Assistant Attorney General (Mark R. Herring,
Attorney General, on brief), for appellee.


A jury convicted Taiveon Tucker ("appellant") of first-degree murder in the commission of

robbery, in violation of Code § 18.2-32; use of a firearm in the commission of murder, in violation

of Code § 18.2-53.1; and robbery, in violation of Code § 18.2-58.  Appellant was seventeen years

old at the time of the offenses and was tried as an adult pursuant to Code § 16.1-269.1.

Appellant asserts two assignments of error.  First, he argues that the evidence was

insufficient to prove he committed the offenses "because no reasonable trier of fact could have

found that [he] committed robbery."  He contends,

> [w]ith no evidence of a taking or a use of force or of use of a firearm,
> there was no robbery and therefore there could be no felony murder
> in the commission of a robbery, nor a use of a firearm during the
> commission of a murder.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In his second assignment of error, appellant asserts that the court "erred by not granting [his] motion to quash the direct indictment for first-degree murder because [Code §] 16.1-269.1(B) mandates a preliminary hearing for juveniles being tried as adults for first-degree murder."

BACKGROUND

A.  The incident

Appellant lived in an apartment building adjacent to the Oakley Townhomes in Henrico County.  On the evening of November 15, 2017, appellant's friend, Dajounieck Wingfield, who lived in the same building, joined him outside.

When appellant saw Wingfield, he asked her "where the jugs were."  Wingfield responded, "I don't know, I don't get into that type of stuff."  Wingfield testified at trial that "jugs" means "robbing somebody or taking what they have."  Detective Christopher Henry of the Henrico County Police Department, who testified as an expert in street practices, languages, and terminology, confirmed Wingfield's explanation of the term and stated that "jug" means "[t]o rob someone."

Wingfield and appellant were joined by other people outside.  Wingfield testified that one man, identified as "Four" or "Fo," had a gun.  Another man, Aarin Anderson, produced cigars, known as "rellos," used for smoking marijuana.  The group smoked together for about twenty-five minutes.  At one point, Wingfield watched appellant and Anderson walk away and talk privately for two to three minutes.  Shortly thereafter, the group dispersed.

Wingfield returned to her apartment and came back outside to smoke a cigar.  About two minutes later, she heard gunshots.  Wingfield sent appellant an Instagram message asking if "he [was] okay."  Appellant responded affirmatively and asked to use Wingfield's cell phone charger. Wingfield refused his request and did not see him again that night.

Anderson, who lived in the same building as appellant and had known him for about a year, testified that on November 15, 2017, he and appellant smoked marijuana in front of the building

with Wingfield and the other men. Although Anderson testified at the preliminary hearing that another individual in the group, Waddell Grant, had a gun, at trial he testified that he did not see anyone with a gun. At one point, appellant borrowed Anderson's cell phone, and later, after Anderson and appellant left the group, they walked toward the Oakley Townhomes "[t]o get some weed." An Oakley maintenance worker testified that he saw two people matching the description of appellant and Anderson in front of the rental office at approximately 9:00 p.m. on November 15, 2017.

While Anderson and appellant were waiting in the Oakley parking lot, appellant borrowed Anderson's cell phone again; when he returned it, appellant told Anderson that he had been talking to the person who would provide the marijuana. Anderson's cell phone records, introduced at trial, showed calls made at 8:24 p.m. and 8:53 p.m.

A car pulled into the parking lot, and Anderson began walking away. He watched appellant go to the passenger side, and from a distance of about three or four parking spaces, Anderson saw appellant open and close the passenger door, walk around the back of the car, and "put[] something in his pocket." Anderson heard a gun fire and glass breaking and saw appellant "at the driver's side window . . . [c]lose enough to touch it." Anderson ran back to his apartment complex.

Within minutes, appellant also returned to the complex looking "shocked," and asked if Anderson "heard it." Anderson did not ask appellant what happened because he "didn't want to know," but he went to a store to buy cigars for them to smoke "[t]he marijuana [they] just got."

At 9:03 p.m. on November 15, 2017, a 911 caller reported two gunshots at Oakley Townhomes and a car parked with its lights on. Henrico County Police Officer Stephen C. Flores responded and found a car with its lights on, engine running, and a broken window. A body, later identified as Ra'quan Mayo, was slumped over in the driver's seat. Mayo had a pistol in his lap and had been shot in the back of his head.

Henrico County Police Sergeant Joseph Morgello also responded to the crime scene, followed a trail of broken glass, and discovered a .45 caliber shell casing about "[e]ight or ten parking places" away from the car. Additionally, the police recovered an unfired .45 caliber cartridge about 96.4 feet from the driver's side of the car. A laboratory analysis concluded that both the casing and cartridge came from the same magazine. Detective Henry testified that an unfired cartridge could be ejected from a gun when the slide is pulled. He explained that in his experience, when a live cartridge has been ejected from a gun, someone has either checked the gun to see that it was loaded or "racked" the gun for purposes of intimidation "to accomplish [a] robbery."

The pistol found in Mayo's lap was a .9mm Glock, which could not have fired the .45 caliber cartridge. Appellant's fingerprints were located on the outside of the front passenger door handle of Mayo's car.

Detective Henry interviewed appellant the following day. Appellant claimed he did not know anyone named Aarin Anderson. When Detective Henry showed him Anderson's photograph, appellant said that "the dreads looked familiar" but again denied knowing him. Appellant also stated that "he had never seen [Mayo] in his life."

Detective Henry interviewed appellant again after arresting him the next day. Despite his initial claim that he did not know Mayo, appellant admitted that he had bought marijuana from Mayo on two occasions before November 15, 2017. Appellant told the detective that on the day of the incident, he wanted to buy one half-ounce of marijuana from Mayo, and Mayo "fronted" him the marijuana to sell.[1]

Appellant also told the detective that when he returned to his apartment after receiving the marijuana from Mayo, he heard a gunshot. He considered texting Mayo to check on him but

---

[1] Detective Henry testified that "fronting" means to supply drugs to a person who would sell them and return a portion of the proceeds.

decided not to because "if he did[,] it would make it look like [appellant] had something to do with it."

Cell phone records established that appellant and Mayo contacted one another twenty-three times on November 15, 2017. Additionally, Mayo's cell phone showed the two incoming calls from Anderson's phone number on November 15, 2017, at 8:24 p.m. and 8:53 p.m. Prior to that date, however, Mayo's cell phone had never received contact from Anderson.

While incarcerated awaiting trial, appellant made several phone calls that were recorded. In one call, appellant stated that if witnesses testified at his trial that "jugs" meant "robbery," then he was "fucked." In another call, appellant proposed that Wingfield receive money to change her testimony.

## B. Procedural history

Appellant was initially arrested for robbery and use of a firearm in the commission of a robbery. After his arrest, he also was charged with second-degree murder under Code § 18.2-32, conspiracy to commit robbery, and use of a firearm in the commission of murder. The Commonwealth filed a notice in the juvenile and domestic relations district court ("the JDR court") to have appellant transferred to circuit court for trial as an adult pursuant to Code § 16.1-269.1. After a probable cause hearing, the JDR court certified all pending charges to the grand jury.

The grand jury returned indictments for the charges and subsequently returned an additional indictment for first-degree murder, also under Code § 18.2-32. At that time, the Commonwealth moved to *nolle prosequi* the second-degree murder charge, which the court granted.

Appellant moved to quash the first-degree murder indictment. He argued that although the second-degree murder charge was transferred to circuit court after a preliminary hearing in the JDR court, he never received a preliminary hearing on the first-degree murder charge, as required by Code § 16.1-269.1(B). The court denied the motion.

At the close of the Commonwealth's case, the court granted appellant's motion to strike the charge of conspiracy to commit robbery. The jury found appellant guilty of first-degree murder in the commission of a robbery, robbery, and use of a firearm in the commission of a murder. The jury acquitted appellant of use of a firearm in the commission of robbery.

ANALYSIS

A. Sufficiency of the evidence to prove robbery

Appellant argues that the evidence was insufficient to prove that he committed robbery because there was no evidence that he took Mayo's marijuana by force, threat, or intimidation. He also contends that because the evidence was insufficient to prove robbery, he could not be convicted of first-degree murder in the commission of robbery or use of a firearm in the commission of murder.

"[W]hen reviewing a challenge to the sufficiency of the evidence to support a conviction, an appellate court considers the evidence in the light most favorable to the Commonwealth, the prevailing party below, and reverses the judgment of the trial court only when its decision is plainly wrong or without evidence to support it." Marshall v. Commonwealth, 69 Va. App. 648, 652-53 (2019). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" Chavez v. Commonwealth, 69 Va. App. 149, 161 (2018) (quoting Banks v. Commonwealth, 67 Va. App. 273, 288 (2017)).

"Robbery is a common-law crime in Virginia, although its punishment is prescribed by Code § 18.2-58." Pritchard v. Commonwealth, 225 Va. 559, 561 (1983). Robbery "is defined as 'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" Ali v. Commonwealth, 280 Va. 665, 668 (2010) (quoting Durham v. Commonwealth, 214 Va. 166, 168 (1973)).

- 6 -

Initially, appellant argues that there was no evidence, direct or circumstantial, of a "taking." He contends that his interaction with Mayo was a consensual transaction for the exchange of drugs. Relying on the lack of testimony concerning the price of the marijuana, he asserts that the evidence established that Mayo "fronted" him the drugs and expected payment later.

However, Wingfield testified that on the date of the robbery and murder, appellant referred to "jugs" in a conversation with her. Both Wingfield and a detective identified the term as referring to robbery. Appellant acknowledged that his reference to "jugs" was incriminating when he mentioned in a phone call following his arrest that if a witness testified that "jugs" meant robbery, he was "fucked." In another phone call, appellant indicated that Wingfield should be paid to change her testimony. The circumstantial evidence establishes that appellant planned and executed the robbery in order to obtain the marijuana. See Johnson v. Commonwealth, 2 Va. App. 598, 604-05 (1986) (finding that circumstantial evidence alone was sufficient to sustain a conviction).

Appellant also contends that the Commonwealth failed to prove the taking was accomplished by force, threat, or intimidation because there was no testimony that anyone saw him with a gun. However, the Commonwealth is not required to rely solely on direct evidence of gun possession to prove robbery with a firearm. See Byers v. Commonwealth, 23 Va. App. 146, 150 (1996) ("[P]roof of 'actual' possession of a firearm under Code § 18.2-53.1 may be established by circumstantial evidence, direct evidence, or both."). "Circumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53 (1983).

Although appellant was not seen with a gun on the night Mayo was killed, circumstantial evidence supports the conclusion that he used a firearm to commit murder during a robbery. Appellant arranged to meet Mayo to obtain drugs, Mayo was killed by gunfire at approximately the

same time the transaction occurred, and appellant gave conflicting statements about his relationship with Mayo and Anderson.  Further, appellant and Anderson were the only people near Mayo at the time he was killed, and detectives recovered both spent and live ammunition at the crime scene from a gun that did not match the one found on Mayo's lap.  Detective Henry's testimony demonstrated that live ammunition may be "racked" from a gun for purposes of intimidation.  "[T]he Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant."  Ragland v. Commonwealth, 67 Va. App. 519, 531 (2017) (quoting Case v. Commonwealth, 63 Va. App. 14, 23 (2014)).  No reasonable hypothesis of innocence flows from the evidence presented at trial, and therefore, the evidence was sufficient to find appellant guilty of robbery.  Additionally, insofar as appellant challenged his convictions for murder and use of a firearm during the commission of murder because they were contingent on an erroneous robbery conviction, we affirm those convictions as well.

### B.  Motion to quash indictment

Appellant asserts that the court erred in denying his motion to quash the indictment for first-degree murder because Code § 16.1-269.1(B) requires a preliminary hearing for juveniles charged with first-degree murder.  Statutory interpretation "presents a pure question of law and is accordingly subject to *de novo* review."  Reineck v. Lemen, 292 Va. 710, 721-22 (2016) (quoting Washington v. Commonwealth, 272 Va. 449, 455 (2006)).  Courts must "apply the plain language of a statute unless the terms are ambiguous or applying the plain language would lead to an absurd result."  Boynton v. Kilgore, 271 Va. 220, 227 (2006) (citation omitted).

Code § 16.1-269.1(B) provides that "[t]he juvenile court shall conduct a preliminary hearing whenever a juvenile 14 years of age or older is charged with murder in violation of [Code §§] 18.2-31, 18.2-32[,] or 18.2-40."  Code § 16.1-269.1(D) further provides,

> Upon a finding of probable cause pursuant to a preliminary hearing under subsection B[,] . . . the juvenile court shall certify the charge, and all ancillary charges, to the grand jury. Such certification shall divest the juvenile court of jurisdiction as to the charge and any ancillary charges. Nothing in this subsection shall divest the juvenile court of jurisdiction over any matters unrelated to such charge and ancillary charges which may otherwise be properly within the jurisdiction of the juvenile court.

Following appellant's arrest, the Commonwealth moved to certify him as an adult for the charges of second-degree murder, conspiracy to commit robbery, and the related firearm charges. After the preliminary hearing, the JDR court granted the Commonwealth's motion and sent the cases to the grand jury. The Commonwealth subsequently directly indicted appellant for first-degree murder and moved the circuit court to *nolle prosequi* the second-degree murder charge. Appellant argues that the Commonwealth was precluded from directly indicting him for first-degree murder in circuit court because his preliminary hearing in the JDR court was for second-degree murder, not first-degree murder.

However, the applicable section of the transfer statute, Code § 16.1-269.1(B), does not delineate the degree of murder that requires a preliminary hearing in the JDR court: "The juvenile court shall conduct a preliminary hearing whenever a juvenile . . . is charged with murder in violation of [Code §§] 18.2-31, *18.2-32[,]* or 18.2-40." (Emphasis added). Code § 18.2-32 addresses both first- and second-degree murder. Given the lack of distinction between the degrees of murder in the transfer statute, it is reasonable to conclude that the General Assembly intended that a single murder preliminary hearing in the JDR court is sufficient even if the Commonwealth subsequently determines that the facts warrant a charge for an elevated degree of homicide.

The limited purpose of a preliminary hearing also supports the denial of appellant's motion to quash. "The primary purpose of a preliminary hearing is to ascertain whether there is reasonable ground to believe that a crime has been committed and the person charged is the one who has committed it." Webb v. Commonwealth, 204 Va. 24, 31 (1963) (holding that an adult's statutory

- 9 -

right to a preliminary hearing is waived when a grand jury has already returned an indictment). The preliminary hearing in the JDR court was to determine "probable cause." Code § 16.1-269.1(D). It functioned as a "screening process . . . to determine whether there [was] . . . reasonable ground to believe that the crime ha[d] been committed and whether the accused [was] the person who committed it." Wright v. Commonwealth, 52 Va. App. 690, 699 (2008) (*en banc*) (quoting Moore v. Commonwealth, 218 Va. 388, 391 (1977)). See also Williams v. Commonwealth, 208 Va. 724, 728 (1968).

As required by Code § 16.1-269.1(B), the JDR court conducted a preliminary hearing for the charge of second-degree murder in violation of Code § 18.2-32. Upon certification of this and other charges to the circuit court, the JDR court was divested of jurisdiction over any ancillary charges and only retained jurisdiction over "unrelated" matters. Code § 16.1-269.1(D). See Holliday v. Commonwealth, 64 Va. App. 168, 169-72 (2014) (holding that conspiracy charges could be brought by direct indictment in circuit court after the JDR court had "certified a murder charge and thereby been divested of jurisdiction" over all ancillary charges). The first-degree murder charge was undoubtedly "related" to the second-degree murder charge because it arose from the same incident. See Code § 16.1-269.1(D). Because the JDR court found probable cause that appellant committed murder in violation of Code § 18.2-32, appellant suffered no prejudice from the denial of an additional preliminary hearing on a different theory of murder also in violation of Code § 18.2-32.

The procedural history in this case establishes that appellant received all necessary protections of the juvenile system. See Kent v. United States, 383 U.S. 541, 556 (1966) (stating that a juvenile's transfer from the jurisdiction of the juvenile court to a circuit court for trial as an adult is "critically important"). As required by Code § 16.1-269.1(B), appellant received a preliminary hearing in the JDR court for murder charged under Code § 18.2-32. Nothing in Code

§ 16.1-269.1(B) requires an additional preliminary hearing for a subsequent elevated murder charge arising from the same facts and also brought under Code § 18.2-32. Accordingly, we find that the court did not err in denying appellant's motion to quash the indictment for first-degree murder.

CONCLUSION

We find no error in the court's conclusion that the evidence was sufficient to establish robbery, first-degree murder in the commission of robbery, and use of a firearm in the commission of murder. Additionally, because appellant had a preliminary hearing in the JDR court for second-degree murder charged under Code § 18.2-32, the court did not err in denying his motion to quash a subsequent indictment for first-degree murder charged under the same statute and arising from the same facts.

Affirmed.