UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Lorish and Callins
Argued by videoconference


ANTHONY J. SLAYTON, S/K/A
   ANTHONY JEROME SLAYTON
                                                          MEMORANDUM OPINION* BY
v.        Record No. 0641-21-2                            JUDGE LISA M. LORISH
                                                          MARCH 29, 2022
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          W. Reilly Marchant, Judge

             Julian P. Viscidi (Parcell, Webb & Baruch, P.C., on briefs), for
             appellant.

             Liam A. Curry, Assistant Attorney General (Mark R. Herring,[1]
             Attorney General, on brief), for appellee.


      Following a bench trial, the Circuit Court of the City of Richmond ("trial court") convicted

Anthony J. Slayton of malicious wounding in violation of Code § 18.2-51, use of a firearm in the

commission of malicious wounding, in violation of Code § 18.2-53.1, maliciously shooting into an

occupied vehicle in violation of Code § 18.2-154, and shooting from a vehicle in violation of Code

§ 18.2-286.1.  Slayton asserts that the evidence presented at trial was insufficient to support the

convictions.  We disagree and affirm.

                                      BACKGROUND

      "Under well-settled principles of appellate review, we consider the evidence presented at

trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v.*

_____

      * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

      [1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

*Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

So viewed, the evidence established that in the late-night hours of August 20, 2020, and into the early morning hours of August 21, 2020, Richmond Police Detectives Edward Aeschlimann, Elmer Fernandez, and Henry Johnson were on assignment monitoring protests in the city of Richmond following the murder of George Floyd. The three detectives were in plain clothes, and they were riding in an unmarked Ford Expedition. Aeschlimann was driving, Fernandez was in the front passenger seat, and Johnson was in the back passenger seat behind Fernandez. Around midnight, Aeschlimann heard a radio transmission from the police department dispatching police units to Mosby Court for a shooting incident. Aeschlimann immediately drove to the Mosby Court area, driving down 18th Street and turning onto Coalter Street, where Mosby Court is located.

As they rode along Coalter Street, the detectives were looking for "anything suspicious . . . anything that would indicate individuals who maybe had been involved in a shooting." After seeing someone "run straight across Little Page" and quickly jump into an SUV, Aeschlimann made a U-turn on Coalter Street and headed back toward Little Page to follow the vehicle.

Almost immediately, Aeschlimann's car "started getting shot at." Detective Johnson later testified that as they made their way back toward Little Page Street, he observed a "small silver car come in at a high rate of speed off of Little Page towards Coalter." Johnson then heard gunfire coming from that vehicle. He could see the "muzzle flash" coming from both the "front and the rear" on the passenger side of the car, but he could not see the faces of the shooters or who were holding the guns. One of the bullets shattered the windshield and grazed Fernandez's shoulder.

- 2 -

Some of the shattered glass struck Fernandez, cutting his forehead and causing minor injuries to his nose, jaw, and arms. Johnson called out over dispatch radio "to let other units know" they were "under fire." The small, silver car sped down Coalter Street, illegally passed several vehicles, crossed over the intersection at 18th and Coalter without stopping, and then turned left onto Oliver Hill Way.

At trial, the Commonwealth played a video of the incident. The video depicts a silver Chevrolet Cruze speeding through the intersection. As the Cruze turns left onto Coalter Street, the video shows what appears to be gunfire emanating from both the front and back passenger sides of the vehicle. The images were also reduced to photographs, which were entered into evidence by the Commonwealth.

Officer Brandon Ball was on patrol in a marked police vehicle near the scene of the offense when Johnson's dispatch came over the radio. Officer Ball, who was conducting a traffic stop on Oliver Hill Way, observed the Cruze turn onto Oliver Hill Way and drive toward him at a high rate of speed. Officer Ball moved to the middle of the street and commanded the driver of the Cruze to stop, blocking the vehicle's path with his body. Officer Ball later testified that he stopped the Cruze within one city block of the location where the shots were fired, mere seconds after the shooting. Slayton was sitting in the front passenger seat. Three other individuals were also in the vehicle. The back passenger window was rolled down, but the front passenger window was not. Officer Ball removed all four occupants from the vehicle and searched it. During the search, Officer Ball lifted the floor mat of the front passenger seat, where Slayton had been sitting, and noticed that "a pop pen was removed from the vehicle and sitting under the dash or the floor mat." Officer Ball described a pop pen as "a plastic pen that pretty much holds up the [insulation] and the carpet securing it to the vehicle so that it is not easily moved around." Suspecting that something might be hidden under the carpet, Officer Ball pulled back the carpet and the insulation and found two .40

caliber, semi-automatic firearms with loaded magazines. Officer Ball retrieved the firearms and ammunition and turned them into the Forensics Department at police headquarters. Officer Ball later observed at trial that Slayton had acted quiet and nervous during the traffic stop.

Richmond Police Investigator Margaret Cunningham Smith, a forensics detective, drove to the scene on the night of the incident. Smith recovered seven .40 caliber cartridge casings on the street where the shooting occurred. Smith also found a silver bullet lodged in one of the tires of the Expedition. Smith later transported the two semi-automatic pistols, identified by her as a "[Sig-Sauer] P320" and a "Glock 23," and the cartridge casings to the Virginia Department of Forensic Science ("DFS") for analysis.

Megan Korneke, a firearms examiner with DFS, testified as an expert in "firearm and tool mark examination and comparison." Korneke testified that she test-fired the P320 and the Glock 23 and collected the bullets and cartridge casings ("test casings") for comparison. She then compared the test casings to the cartridge casings found at the crime scene and the bullet recovered from the Expedition. Korneke concluded that the cartridge casings and the bullet recovered from the crime scene were fired from the P320 and the Glock 23 recovered from the Cruze. Korneke memorialized her findings in a certificate of analysis, which was introduced into evidence by the Commonwealth.

Finally, the Commonwealth played a recording of a jail call Slayton made to an unidentified female while awaiting trial, in which he stated that his co-defendant "threw [him] under the bus" by telling police officers he was the shooter. The trial court listened to the recorded jail call and then entered it into evidence.

Upon the conclusion of the Commonwealth's case, Slayton moved to strike the evidence, arguing it was insufficient to support a finding that he was either the actual shooter, or that he acted in concert with any of the other occupants of the vehicle. After considering arguments of counsel, the trial court ruled the evidence was sufficient to overcome the motion to strike "either as the actual

- 4 -

perpetrator and the shooter or as a principal in the second degree or someone who is in concert of action with the others." The trial court found Slayton guilty of all four offenses. Before sentencing, Slayton moved the trial court to reconsider its verdicts, again arguing the evidence failed to prove Slayton was the shooter or that he shared the criminal intent of the other occupants of the vehicle. The trial court disagreed, specifically finding that Slayton "was shooting the gun out of the front passenger seat." The trial court therefore denied the motion to set aside the verdicts. The trial court then sentenced Slayton to thirty-three years in prison, with twenty-four years suspended.

This appeal followed.

ANALYSIS

Slayton asserts that the evidence presented at trial was insufficient to support a finding that he acted as a principal in the first degree, or, in the alternative, that he acted as a principal in the second degree by sharing the criminal intent of the other occupants of the vehicle. Slayton argues the evidence did not exclude every reasonable hypothesis of innocence and therefore the Commonwealth's case did not support the convictions beyond a reasonable doubt. We disagree.

When considering the sufficiency of the evidence presented below, we "presume the judgment of the trial court to be correct and reverse only if the trial court's decision is plainly wrong or without evidence to support it." *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*) (citation omitted). We must therefore "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn" from it. *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002) (citation omitted). "The credibility of the witnesses and the weight of the evidence are matters to be determined solely by the trier of fact." *Id.* (citing *Swanson v. Commonwealth*, 8 Va. App. 376, 378-79 (1989)). Thus, "[i]f there is evidence to support the conviction, we will not substitute our judgment for that of the trier of fact, even were our opinion to differ." *Id.* at 380

- 5 -

(citation omitted). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Kelly*, 41 Va. App. at 257 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Moreover, where, as here, the evidence of one's guilt rests almost entirely upon circumstantial evidence, "the reasonable doubt standard requires proof 'sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* at 258 (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). To that end, "[a]ll necessary circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the evidence create a suspicion of guilt, however strong, or even a probability of guilt, but must exclude every reasonable hypothesis save that of guilt." *Morris v. Commonwealth*, 47 Va. App. 34, 47 (2005) (quoting *Webb v. Commonwealth*, 204 Va. 24, 34 (1963)). To accomplish that, "the chain of circumstances must be unbroken and the evidence as a whole must be sufficient to satisfy the guarded judgment that both the *corpus delicti*[2] and the criminal agency of the accused have been proved to the exclusion of any other reasonable hypothesis and to a moral certainty." *Webb*, 204 Va. at 34. "Nevertheless, 'the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant.'" *Banks v. Commonwealth*, 67 Va. App. 273, 291 (2017) (quoting *Archer v. Commonwealth*, 26 Va. App. 1, 12 (1997)). In the end, "[w]hether an alternative hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Archer*, 26 Va. App. at 13.

---

[2] *Corpus delicti* ("the body of a crime") simply means "the fact that the crime charged has been actually perpetrated." *Rams v. Commonwealth*, 70 Va. App. 12, 29 (2019) (quoting *Corpus Delicti, Black's Law Dictionary* (7th ed. 1993)).

All four code sections on which Slayton was tried require the Commonwealth to prove that he used a firearm to commit the offenses. Indeed, Code § 18.2-51 provides: "If any person maliciously shoot, stab, cut, or wound any person or by any means cause him bodily injury, with the intent to maim, disfigure, disable, or kill, he shall, except where it is otherwise provided, be guilty of a Class 3 felony."[3] Code § 18.2-53.1 provides in pertinent part: "It shall be unlawful for any person to use or attempt to use any . . . firearm or display such weapon in a threatening manner while committing or attempting to commit . . . malicious wounding as defined in § 18.2-51." Code § 18.2-154 provides that any "person who maliciously shoots at . . . any motor vehicle or other vehicles when occupied by one or more persons, whereby the life of any person . . . in such motor vehicle or other vehicle, may be put in peril, is guilty of a Class 4 felony." Finally, Code § 18.2-286.1 provides: "Any person who, while in or on a motor vehicle, intentionally discharges a firearm so as to create the risk of injury or death to another person or thereby cause another person to have a reasonable apprehension of injury or death shall be guilty of a Class 5 felony." The trial court, after considering all the evidence and the arguments of counsel, expressly found Slayton "was shooting the gun out of the front passenger seat"—that is, that he acted as a principal in the first degree.

Slayton does not contest that a shooting from the vehicle occurred. He merely asserts that the evidence failed to prove *he* was the shooter. Slayton relies on the facts that there were no eyewitnesses to his involvement, there was no evidence of gun residue suggesting he had fired the weapons, there was no DNA evidence proving he handled the weapons, and there were no statements made by Slayton or his co-defendants admitting he was the shooter. Slayton concludes that the evidence proves only his presence in the car during the shooting, and he hypothesizes that, because

---

[3] Slayton does not argue the evidence fails to prove his specific intent to maim, disfigure, disable, or kill. Thus, the pertinent query is whether he committed the criminal acts necessary to make him either a principal in the first or second degree.

any of the other three occupants could have been the shooter, no rational finder of fact could have found him guilty of the crimes beyond a reasonable doubt. The facts, however, together with all reasonable inferences, suggest otherwise.

Detective Johnson testified that as the Cruze turned onto Coalter Street, he could hear gunfire coming from that vehicle and he saw muzzle flashes coming from both the front and back passenger side of the car. The gunfire tore through the front windshield of the Expedition, injuring Fernandez. Mere seconds later, Officer Ball stopped the Cruze one city block away from the crime scene. Slayton was sitting in the front passenger seat. The pop pen had been removed and the firearms used in the shooting were already secreted under the floor mat and insulation, at Slayton's feet. The Commonwealth also introduced video surveillance, which shows two flashes of light captured at the front passenger side and the back passenger side of the Cruze as it sped by the Expedition. No evidence was presented of any bullet fragments or cartridge casings located elsewhere inside the Cruze, which suggests the shots were fired from the passenger seats. There was also no evidence to suggest that the occupants of the vehicle exchanged seats as the car sped down Coalter, passing other vehicles, and turned onto Oliver Hill.

The Commonwealth relies on Officer Ball's observation at trial that Slayton acted nervously once the guns were found under the floor mat. But that is not determinative here. Courts have long recognized that there are many reasons why a person, particularly a Black man like Slayton, could behave nervously during an interaction with police.[4] In fact, this encounter occurred following a

_____

[4] *See, e.g.*, *Commonwealth v. Evelyn*, 152 N.E.3d 108, 125-26 (Mass. 2020) ("Just as an innocent African-American male might flee in order to avoid the danger or indignity of a police stop, the fear of such an encounter might lead an African-American male to be nervous or evasive in his dealings with police officers. We therefore significantly discount the weight of the defendant's nervous and evasive behavior." (citation omitted)); *State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989) ("When confronted with a traffic stop, it is not uncommon for drivers and passengers alike to be nervous and excited."); *State v. Scott*, 412 So. 2d 988, 989 (La. 1982) ("Nervousness on the part of a black laborer when confronted by an armed uniformed police officer does not seem so unusual as to indicate guilt or criminal proclivity."); *see also State v.*

series of highly publicized police shootings of African-Americans and the detectives involved in this incident were patrolling protests related to these events that very night. The Commonwealth also argues that Slayton's statement during the jail call that his co-defendant "threw him under the bus" by telling the police he was the shooter was an admission of guilt. In the context of this case, the remaining circumstances obviate our need to opine on the meaning of this phrase.

In any event, we find that Slayton's alternative hypotheses of innocence that he switched places with another passenger just after the shooting, or that the driver shot across him out of the passenger's side window, are simply not supported by the evidence or any reasonable inferences. Because the traffic stop occurred mere seconds after the shooting, less than the time necessary to travel one city block at a high rate of speed, there was insufficient time for Slayton to have switched seats with another passenger and for someone to have hidden the guns under the passenger seat floorboard. And there is no reason why Slayton would have agreed to trade seats with one of the shooters. Indeed, it would have gone against his interest to do so. Finally, the fact that the shooting occurred as the Cruze took a left-hand turn onto Oliver Hill Way, and the video shows that it did not swerve or otherwise veer from its path, makes it improbable that the driver reached across Slayton to shoot out of the window.

The trial court, therefore, did not err in finding Slayton guilty as a principal in the first degree of all four offenses. Because we find the evidence sufficient to support the trial court's finding that Slayton acted as a principal in the first degree, we need not reach whether the evidence sufficiently proved he acted as a principal in the second degree.[5]

---

*Clinton-Aimable*, 232 A.3d 1092, 1103 (Vt. 2020) (Reiber, C.J., concurring) ("A black driver, impacted by the entirety of the black American experience, may likely become extremely nervous when face-to-face with a police officer while stopped on the side of the road.").

[5] "Following the traditional doctrine of judicial restraint, [appellate courts] decide cases 'on the best and narrowest grounds available.'" *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 438 (2020) (alteration in original) (quoting *Levick v. MacDougall*, 294 Va. 283, 302 (2017)).

CONCLUSION

The evidence presented at trial, when taken in the light most favorable to the Commonwealth and considering all fair inferences that may be drawn therefrom, supports the trial court's conclusion that Slayton was shooting a gun from the front passenger seat of the car. The circumstances, taken as a whole, exclude every reasonable hypothesis of Slayton's innocence. Because the trial court's findings are not plainly wrong or without evidence to support them, we affirm.

*Affirmed.*